*527 Reversed and remanded by published opinion. Judge GREGORY wrote the opinion, in which Chief Judge TRAXLER and Judges WILKINSON, KING, DUNCAN, DAVIS, KEENAN, WYNN, and DIAZ joined. Judge DAVIS wrote a concurring opinion. Judge SHEDD wrote a dissenting opinion, in which Judges NIEMEYER and AGEE joined. Judge NIEMEYER wrote a separate dissenting opinion.
OPINION
GREGORY, Circuit Judge:
Without warning, Officer Robert Purnell shot Frederick Henry, an unarmed man wanted for misdemeanor failure to pay child support, when he started running away. In the ensuing § 1983 action, the parties stipulated that Purnell had intended to use his Taser rather than his gun and the district court granted him summary judgment. However, because Tennessee v. Garner prohibits shooting suspects who pose no significant threat of death or serious physical threat, and because Purnell’s use of force could be viewed by a jury as objectively unreasonable, we reverse and remand.
I.
Since this case stems from the grant of summary judgment for Purnell, we recount the facts in the light most favorable to the non-movant, Henry. See George & Co. LLC v. Imagination Entm’t Ltd., 575 F.3d 383, 392 (4th Cir.2009).
In 2003, a Maryland state court ordered Henry to either pay child support or report to jail on September 8, 2003. When Henry did not comply,- a warrant was issued for his arrest on October 9, 2003 for second degree escape. Maryland law defines second degree escape as “knowingly failfing] to obey a court order to report to a place of confinement.” Md.Code Ann., Crim. Law, § 9^405(a)(2). “A person who violates this section is guilty of the misdemeanor of escape in the second degree ....” Id. § 9^405(b) (currently codified at § 9-405(c)).
Eleven days later, on October 20, 2003, Purnell first attempted to serve the warrant at Henry’s last known address, a trailer home in Eden, Maryland. Purnell approached a man who was sitting on the front steps of the trailer and who identified himself as Henry’s friend. The man said Henry worked at American Paving Company and offered to give Purnell’s name and number to Henry’s wife, who was inside the trailer. Purnell then went to the American Paving Company, where an employee said that Henry had not worked in three months, and showed Purnell a photo of Henry. The photo appeared to match the man who had identified himself as Henry’s friend. Purnell returned to the trailer home later that day and spoke with Henry’s wife. She told Purnell that Henry was not home, allowed Purnell to enter the trailer, and said that Henry worked for a man in a white pickup truck. Purnell seemed “very upset” and told her that he was going to “get [Henry] for pulling a whammy” on him. J.A. 534-35. The next day, October 21, 2003, Henry’s wife called Purnell to add that she had given Henry the message and that he was traveling to Baltimore to try to raise bail money.
On October 23, 2003, while in the vicinity for other reasons, Purnell passed by a white pickup truck. Purnell followed the truck and found it parked in the driveway of the trailer home he had previously visited. Purnell approached the truck, which contained a driver, Thomas Walston, and two passengers, Gene Moore and Henry. Purnell came to the driver’s side window and asked each man if he was Henry. Each initially said no, but when Purnell asked again, Henry admitted his identity. *528 Henry then exited the vehicle and proceeded to the back of the truck with Purnell. Henry then “started to run towards the front of his truck which was in the direction of the trailer where [he] lived.” J.A. 537-58. Eyewitness Walston described Henry as “kind of jogging a little bit.” J.A. 13-14. “Within a second,” Purnell started running after him; Purnell was roughly five to ten feet away. J.A. 257, 538.[2]
Purnell had holstered two weapons on his right leg: on his hip was a service revolver, a Glock .40 caliber handgun. On his thigh was an electroshock weapon, a Taser M26 (hereafter, the “Taser”). The Taser was “just underneath [the] service pistol,” approximately twelve inches apart. J.A. 139, 200. Purnell un-holstered his Glock and held it in the horizontal firing position for “[t]hree to five seconds.” J.A. 269, 271. He did not issue any verbal warning messages, commands, or instructions to halt. Purnell then fired a single shot, striking Henry in the elbow. Walston, an eyewitness, said Purnell “shot [Henry] before he got past the far end of the trailer.” J.A. 13-14. Purnell caught up with Henry, who was lying on the ground, repeating “[h]e shot me, [h]e shot me,” and talking about how much it hurt. J.A. 13. Purnell said he “never intended to shoot Mr. Henry, that [he] had grabbed the wrong weapon.” J.A. 139. Purnell called an ambulance and retrieved medical supplies to slow Henry’s bleeding.
II.
This case has a long procedural history: In March 2004, Henry brought this § 1983 action alleging Purnell violated his Fourth Amendment right to be free from seizures effectuated by excessive force.
In May 2004, Purnell motioned for the district court to dismiss the case or grant summary judgment in his favor. Purnell contended that he had not “seized” Henry and, alternatively, that he was entitled to qualified immunity. The district court denied Purnell’s motion because his “assertions [that he drew the wrong weapon] necessarily depend upon his credibility and therefore give rise to a genuine dispute of material fact.” J.A. 16.
In June 2004, Purnell filed an interlocutory appeal, claiming that the record did not support the district court’s conclusion that he was not entitled to qualified immunity. We dismissed the appeal for lack of jurisdiction because “Purnell’s argument ... challenges the district court’s factual finding.” Henry v. Purnell, 119 Fed.Appx. 441, 443 (4th Cir.2005) (unpublished) (per curiam) (hereafter, “Purnell I ”).
In June 2005, Henry moved for leave to file an amended complaint, which the district court granted. Henry added a claim for excessive force based on the Maryland Constitution’s Declaration of Rights.
On November 10, 2005, the parties entered into a stipulation “for the purposes of this litigation, that on October 22, 2003, [Purnell] intended to un-holster and discharge his Taser M26 which was mounted in a thigh holster below his service weapon, a Glock .40 caliber handgun. Instead, he un-holstered and fired his service weapon, believing that it was his Taser M26.” J.A. 30.
In November 2005, Purnell filed a second motion for summary judgment, arguing that the Fourth Amendment was inap *529 plicable because he never intended to seize Henry with a gun. Alternatively, Purnell argued he was entitled to qualified immunity and was also immune from state tort liability. Henry opposed summary judgment on the grounds that the shooting was a seizure, that outstanding issues of material fact had to be resolved by a jury, and that Purnell was not entitled to qualified immunity. Henry stressed several factors which made Purnell’s conduct unreasonable, such as his failure to give a warning or command before firing. Henry also pointed out Purnell’s failure to notice physical differences between the Taser and Glock, including the Taser’s safety switch, weight, color, and holster position. The parties also disputed the production of additional evidence about Taser training.
In April 2006, the district court issued its first opinion, denying Purnell’s motion for summary judgment and granting Henry’s motion to compel new evidence about Taser training materials. Henry v. Purnell, 428 F.Supp.2d 393, 395-98 (D.Md. 2006). It found “the evidence on summary judgment [was] fully sufficient to create a jury issue on the question of whether Purnell was grossly negligent.” Id. The district court also proposed “a ‘heightened culpability element’ should be added to a Fourth Amendment civil claim.” Id. at 399. The court acknowledged that this was “arguably inconsistent with current law,” “difficult to reconcile with a strict reading of’ the objective reasonableness test set out in Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), and partially “inconsistent with the literal language of Graham.” Henry, 428 F.Supp.2d at 399-400, 401 n. 9.[3]
Purnell appealed to this Court again, claiming that the district court erred in concluding that he “seized” Henry and denying him qualified immunity. J.A. 7-8. In September 2007, we affirmed in part and vacated in part. Henry v. Purnell, 501 F.3d 374 (4th Cir.2007) (hereafter, “Purnell If”).[4] We affirmed the district court’s determination that Purnell’s shooting of Henry was a “seizure” under the Fourth Amendment. Id. at 381-82. But we vacated and remanded the case for the district court to “reassess the issue of whether a constitutional violation occurred in light of the proper burden of proof and the discovery materials that it ordered Purnell to produce.” Id. at 384. If on remand Henry “established] that the seizure in this ease was unreasonable (ie., that Purnell’s mistake in using the Glock rather than the Taser was unreasonable),” then we suggested that Purnell would “have the opportunity to demonstrate his entitlement to qualified immunity.” Id. at 384.
On remand, Henry received the additional discovery he had requested about Purnell’s weapons training and the sheriffs use of force policy. These included more than two hundred pages of training materials and depositions.[5] See generally, *530 J.A. 285-514, 539-542, 549. Discovery also revealed several physical differences between the Glock and Taser.[6]
In March 2008, Purnell filed his third motion for summary judgment, stressing that he had “no field training with, or field use of, the Taser prior to the occurrence.” J.A. at 115. Purnell also emphasized that the Taser’s manufacturer had warned about holstering two weapons on the same leg, but that warning was “never imparted to [Purnell] or anyone else.” J.A. 115. In opposing the motion Henry argued that material facts remained in dispute and that Purnell’s mistake was unreasonable because he did not “comply with multiple police department regulations,” which resulted in a “reckless failure to take steps to avoid the impermissible use of excessive force.” J.A. at 520-21. Henry stressed that “[i]t has been clearly established ... [that] reckless conduct on the part of a police officer that directly leads to an accidental or unintentional shooting violates the suspect’s Fourth Amendment rights.” J.A. 526 (citing Jenkins v. Averett, 424 F.2d 1228, 1232 (4th Cir.1970)). Henry also maintained his state law claim.
In June 2008, the district court issued its second opinion, granting Purnell’s motion for summary judgment. Henry v. Purnell, 559 F.Supp.2d 648 (D.Md.2008). The court stressed that “the dispositive question is whether, under the circumstances and filtered through the lens of the officer’s perception, it was reasonable for Purnell to believe that the weapon he unholstered and fired was the Taser.” Id. at 651-52 (quotations and citations omitted). The court concluded that Purnell’s belief was reasonable because his training was “quite minimal” and there was apparently “no discussion about the possibility of erroneous weapon usage.” Id. at 652.[7]
In September 2010, a divided panel of this court affirmed the district court decision. Henry v. Purnell, 619 F.3d 323 (4th Cir.2010); see also id. at 343 (Gregory, J., dissenting). Henry moved for rehearing and rehearing en banc. We granted rehearing en banc and now, reverse and remand for trial.
*531 III.
Henry first maintains that the district court erred in granting summary judgment to Purnell on Henry’s § 1983 claim. We agree.
Whether a party is entitled to summary judgment is a question of law we review de novo using the same standard applied by the district court. Canal Ins. Co. v. Distrib. Servs., Inc., 320 F.3d 488, 491 (4th Cir.2003). Summary judgment is appropriate only if taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party, “no material facts are disputed and the moving party is entitled to judgment as a matter of law.” Ausherman v. Bank of Am. Carp., 352 F.3d 896, 899 (4th Cir.2003).
Purnell contends that he was rightly granted summary judgment on the basis of qualified immunity because the parties stipulated that he mistakenly used his firearm instead of his Taser. Henry argues that we should disregard Purnell’s subjective intent (to draw his Taser) and that Purnell’s conduct was objectively unreasonable.
Qualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful. Saucier v. Katz, 533 U.S. 194, 206, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), overruled, in part, Pearson v. Callahan, 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009); see also Brockington v. Boykins, 637 F.3d 503, 506 (4th Cir.2011). “Following the Supreme Court’s recent decision in Pearson [ ], we exercise our discretion to use the two-step procedure of Saucier [ ], that asks first whether a constitutional violation occurred and second whether the right violated was clearly established.” Melgar v. Greene, 593 F.3d 348, 353 (4th Cir.2010) (citations omitted). “If [an officer] did not violate any right, he is hardly in need of any immunity and the analysis ends right then and there.” Abney v. Coe, 493 F.3d 412, 415 (4th Cir.2007).
The Fourth Amendment’s prohibition on unreasonable seizures includes the right to be free of “seizures effectuated by excessive force.” Schultz v. Braga, 455 F.3d 470, 476 (4th Cir.2006). Whether an officer has used excessive force is analyzed under a standard of objective reasonableness. Scott v. Harris, 550 U.S. 372, 381, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007); see also Kentucky v. King, — U.S.-, 131 S.Ct. 1849, 1859, 179 L.Ed.2d 865 (2011) (“Our [Fourth Amendment] cases have repeatedly rejected a subjective approach, asking only whether the circumstances, viewed objectively, justify the action.”) (internal quotation marks and citations omitted). Thus, courts determine “whether the officers’ actions are ‘objectively reasonable’ in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.” Graham v. Connor, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). In considering whether an officer used reasonable force, a court must focus on the moment that the force is employed. Elliott v. Leavitt, 99 F.3d 640, 643 (4th Cir.1996). At the summary judgment stage, once we have viewed the evidence in the light most favorable to the nonmovant, the question of whether the officer’s actions were reasonable is a question of pure law. Scott, 550 U.S. at 381 n. 8, 127 S.Ct. 1769. It is in light of these legal principles that we address whether the evidence, viewed in the light most favorable to Henry, shows that Purnell used objectively unreasonable force.
A.
A police officer who shoots a fleeing suspect without “probable cause to *532 believe that the suspect poses a significant threat of death or serious physical injury to the officer or others” violates that suspect’s Fourth Amendment rights. Tennessee v. Garner, 471 U.S. 1, 3, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). “Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so.” Id. at 11, 105 S.Ct. 1694.[8]
The objective circumstances of this case are that Purnell shot a fleeing suspected misdemeanant whom he had no reason to believe was a threat. Henry had an eleven-day old warrant issued for a misdemeanor — failure to pay child support. Nothing in the record suggested Henry had any history of violence. That Henry had previously hidden his identity does not imply he was prone to aggression. Purnell had already been inside Henry’s home. Henry’s home address, wife’s identity, former employer, and employer’s car were all known. The officer also knew that Henry had left town to raise bail money and thereafter planned to return to pay for bail. When police approached Henry’s car, he voluntarily identified himself and exited the car. He then began running away.
Thus, critically, this case presents nothing to suggest Henry posed any threat whatsoever — no menacing conduct and no violent criminal history. To the contrary — police had significant information about Henry’s likely whereabouts, motives, associations, and appearance. In sum, a reasonable officer in these circumstances would have had no grounds for believing Henry was armed or dangerous.[9] The parties do not seriously dispute as much.
The parties have stipulated, however, that the shooting here was based on a mistake of fact insofar as Purnell believed he was firing his Taser rather than his Glock. Based on this stipulation, Purnell attempts to defend the constitutionality of his actions by maintaining that he simply made an “honest mistake.” Appellee’s Br. 22 (internal quotation marks omitted). But it is not the honesty of Purnell’s intentions that determines the constitutionality of his conduct; rather it is the objective reasonableness of his actions. It is certainly true that mistaken, but reasonable, decisions do not transgress constitutional bounds. See, e.g., McLenagan v. Karnes, 27 F.3d 1002 (4th Cir.1994). All actions, however, mistaken or otherwise, are subject to an objective test.
There were several facts that Purnell knew or should have known that would have alerted any reasonable officer to the fact that he was holding his Glock. First, and most basically, Purnell knew he carried his Taser in the holster on his right thigh, which was about a foot lower than the holster on his hip that held his Glock. See Sevigny v. Dicksey, 846 F.2d 953, 957 *533 n. 5 (4th Cir.1988) (“Objective inquiry into the reasonableness of an officer’s perception of the critical facts leading to an arrest ... must charge him with possession of all the information reasonably discoverable by an officer acting reasonably under the circumstances. Indeed his subjective beliefs about the matter, however induced, are actually irrelevant to the inquiry.”) (internal quotation marks omitted). Second, Purnell could feel the weight of the weapon he held in his hand, which, at about 38 ounces, was nearly twice the weight of his Taser. Third, Purnell knew the Taser had a thumb safety that had to be flipped to arm the weapon. The Glock he was holding had no thumb safety.[10] This was not a situation in which the facts known to the officer led to multiple reasonable inferences.
It bears emphasis that this also was not a situation in which circumstances deprived Purnell of the opportunity to fully consider which weapon he had drawn before firing.[11] See Graham, 490 U.S. at 397, 109 S.Ct. 1865 (explaining that courts must make “allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving”). As he pursued Henry in an attempt to arrest him for a fairly minor, non-violent crime, Henry had his back to Purnell and was not threatening him or anyone else in any way. There was no evidence indicating that Purnell did not have the split-second he would have needed to at least glance at the weapon he was holding to verify that it was indeed his Taser and not his Glock.[12]
For all of the reasons set out above, when the record is viewed in the light most favorable to Henry, Henry can show Purnell’s actions were not objectively reasonable.[13] Thus, the evidence forecasted in the record by Henry is sufficient to show that Purnell violated Henry’s Fourth Amendment rights.[14]
*534 B.
Having concluded based on the facts we must accept at the summary judgment stage that Purnell’s use of force would have been unreasonable, we now turn to the second prong in the qualified immunity analysis, which requires this Court to decide “whether the [constitutional] violation was of a ‘clearly established’ right.” Valladares v. Cordero, 552 F.3d 384, 388 (4th Cir.2009). The second prong is “a test that focuses on the objective legal reasonableness of an official’s acts.” Harlow v. Fitzgerald, 457 U.S. 800, 819, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). An official will not be held liable unless “[t]he contours of the right [he is alleged to have violated were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.” Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). “The qualified immunity standard ‘gives ample room for mistaken judgments’ by protecting ‘all but the plainly incompetent or those who knowingly violate the law.’ ” Hunter v. Bryant, 502 U.S. 224, 229, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (quoting Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)). “The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.” Saucier, 533 U.S. at 202, 121 S.Ct. 2151.
Here, Henry can show under prong one of the qualified immunity analysis that a reasonable officer would have realized he was holding a firearm when shooting. Under prong two, it would have been clear to a reasonable officer that shooting a fleeing, nonthreatening misdemeanant with a firearm was unlawful. This basic legal principle had been established by the Supreme Court years earlier in Gamer.
Purnell nevertheless argues that he is entitled to qualified immunity because it was not clearly established at the time of the shooting that it would be unconstitutional for an officer to fire his weapon at the suspect under these facts when he believed he was holding his Taser. But Purnell fails to understand that his subjective beliefs or intentions have no place in our constitutional analysis, which concerns the objective reasonableness of the officer’s conduct in light of the relevant facts and circumstances.[15] Graham, 490 U.S. at 397, 109 S.Ct. 1865 (explaining that in resolving qualified immunity questions, courts inquire “whether the officers’ actions are ‘objectively reasonable’ in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation”); Harlow, 457 U.S. at 818, 102 S.Ct. 2727 (explaining that qualified immunity protects government *535 officials “from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known”). Indeed, objectivity has been the touchstone of qualified immunity law for nearly thirty years.[16] The Supreme Court has made clear that the “Fourth Amendment inquiry is one of ‘objective reasonableness’ under the circumstances, and subjective concepts ... have no proper place in that inquiry.” Graham, 490 U.S. at 399, 109 S.Ct. 1865. “[AJll claims that law enforcement officers have used excessive force ... should be analyzed under the Fourth Amendment and its ‘reasonableness’ standard.” Id. at 395, 109 S.Ct. 1865 (emphasis in original). See also Anderson, 483 U.S. at 641, 107 S.Ct. 3034 (holding that an officer’s subjective belief about the nature of his conduct is “irrelevant” for qualified immunity purposes).
Similarly, our Court has consistently conducted an objective analysis of qualified immunity claims and stressed that an officer’s subjective intent or beliefs play no role. In Melgar v. Greene, we made clear that “ ‘an officer’s good intentions’ do not make objectively unreasonable acts constitutional.” 593 F.3d at 361 (citations omitted). We reiterated in Owens v. Lott that the qualified immunity “determination ‘is an objective one, dependent not on the subjective beliefs of the particular officer at the scene, but instead on what a hypothetical, reasonable officer would have thought in those circumstances.’ ” 372 F.3d 267, 279 (4th Cir.2004) (quoting Wilson v. Kittoe, 337 F.3d 392, 402 (4th Cir.2003)). And in Clem v. Corbeau, we held that “[w]e may assume that [an officer] subjectively believed that the force he used was not excessive; that, however, is not the question. The question is ‘whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.’” 284 F.3d 543, 552-553 (4th Cir.2002) (citations omitted). See also Jones v. Buchanan, 325 F.3d 520, 527 (4th Cir.2003) (“We do not consider the officer’s ‘intent or motivation.’ ”) (citing Elliott v. Leavitt, 99 F.3d 640, 642 (4th Cir.1996)); Rowland v. Perry, 41 F.3d 167, 173 (4th Cir.1994) (“Subjective factors involving the officer’s motives, intent, or propensities are not relevant.”).
In the end, this may be a case where an officer committed a constitutionally unreasonable seizure as the result of an unreasonable factual mistake. If he did, he is no more protected from civil liability than are the well-meaning officers who make unreasonable legal mistakes regarding the constitutionality of their conduct. See Pearson, 129 S.Ct. at 815 (“The protection of qualified immunity applies regardless of whether the government official’s error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.”) (internal quotation marks omitted). Although officers are only human and even well-intentioned officers may make unreasonable mistakes on occasion, the doctrine of qualified immunity does not serve to protect them on those occasions.
*536 IV.
Purnell argues that even if the district court erred in granting his summary judgment motion on the federal claim, he was nonetheless entitled to summary judgment on the state claim on the basis of statutory immunity. We disagree.
Maryland Declaration of Rights Articles 24 and 26 prohibit employment of excessive force during a seizure. Randall v. Peaco, 175 Md.App. 320, 927 A.2d 83, 89 (2007). The standards for analyzing claims under these articles are the same as for analyzing Fourth Amendment claims. Id. Thus, from our conclusion that the facts, viewed in the light most favorable to Henry, showed Purnell violated Henry’s Fourth Amendment rights, it follows that Purnell also violated his rights under Articles 24 and 26.
However, Maryland officials are granted immunity under the Maryland Tort Claims Act (“MTCA”), Md.Code State Gov’t, § 12-101 et seq., for state constitutional violations committed within the scope of their duties when the violations are made “without malice or gross negligence.” Lee v. Cline, 384 Md. 245, 863 A.2d 297, 307 (2004); Md.Code State Gov’t §§ 12-101(a)(6), 12-105. And, “[u]n-like qualified immunity from claims of violations of federal rights under § 1983, the question of immunity for State personnel from State law torts is a subjective one.” Newell v. Runnels, 407 Md. 578, 967 A.2d 729, 763 (2009).
An officer’s actions are grossly negligent when they are “so heedless and incautious as necessarily to be deemed unlawful and wanton, manifesting such a gross departure from what would be the conduct of an ordinarily careful and prudent person under the same circumstances so as to furnish evidence of indifference to consequences.” State v. Albrecht, 336 Md. 475, 649 A.2d 336, 348 (1994) (internal quotation marks and citation omitted). Whether an officer’s actions are grossly negligent, and therefore unprotected by statutory immunity, is generally a question for the jury. Taylor v. Harford County Dep’t of Soc. Servs., 384 Md. 213, 862 A.2d 1026, 1034 (2004).
We conclude that a reasonable jury could find that Purnell was grossly negligent in failing to make even a minimal effort to verify that he had drawn his Taser. Although Purnell stated that he was never “told directly” during his training, he said that “[i]t was implied” and “understood” that he should make sure that he was in fact holding his Taser rather than a firearm before firing. J.A. 512. Especially in light of the fact that the Taser and firearm were holstered on the same side of Purnell’s body, a reasonable jury could conclude that such verification would only amount to common sense. In this case, in a situation where there was no particular exigency and where Purnell was attempting to arrest a nondangerous person for a relatively minor crime, a jury could reasonably find that his decision to fire his weapon without attempting to verify that he had drawn his Taser rather than his Glock amounted to gross negligence.
V.
Purnell’s use of deadly force against Henry was objectively unreasonable and violated clearly established law, namely Tennessee v. Gamer’s prohibition against shooting suspects who pose no significant threat of death or serious physical injury to the officer or others. Nothing removes this case from the straightforward context of Gamer. Consequently, we hold that Purnell was not entitled to qualified immunity.[17] Furthermore, we hold that a jury *537 could reasonably find that Purnell’s conduct amounted to gross negligence. For these reasons, the decision of the district court is

REVERSED AND REMANDED.

. Henry claimed that he never had any physical contact with Purnell. In his affidavit, Purnell stated that "although I had stumbled backward when Mr. Henry pushed away, I recovered and reached for my Taser." J.A. 139. In his deposition, Purnell said that Henry "pushed away” with "both arms,” and that Purnell "fell backwards and caught himself” on his “car and [] right leg.” J.A. 256.

.Instead, the court advocated a narrow reading of Graham, reasoning that it was "not entirely clear, that [objective reasonableness] was the [Supreme] Court’s intended meaning (or that it would have been the Court's intended meaning had it foreseen the confused manner in which the law subsequently developed).” Henry, 428 F.Supp.2d at 401. Under any reading of Graham, the district court concluded that "the time has come for appellate courts to revisit the issue of whether an element of culpability greater than negligence should explicitly be made a component of a Fourth Amendment civil claim.” Id. at 402.

. The opinion was filed by two judges, a quorum of the panel under 28 U.S.C. § 46(d), because a third judge heard oral argument but did not participate in the decision. 501 F.3d at 376 n. 1.

. On August 21, 2003, Purnell took a three- and-a-half hour Taser training class with six or seven other individuals and was certified *530 in Taser use. That training included a PowerPoint presentation with 150 slides, which discussed the "Pro's & Con’s” of different holster configurations. J.A. 297-447. The training explicitly discussed the dangers of carrying a gun and Taser on the same leg, known as a "dominant side carry.” J.A. 332. The training warned that this creates a "Higher Risk of Confusion Depending on Training.” J.A. 332. The presentation also detailed "3 incidents of accidental shootings by mistaken weapon,” in California and Minnesota. J.A. 332. As a result of these accidents, one of which was fatal, the training warned that "[a]ll three agencies have since switched to a support side carry and have yellow M26s.” J.A. 332. The closing statement of the training read as follows: "The most important decision an officer can malee is whether or not to engage deadly force upon a person.” J.A. 450. The class also included a hands-on component where Purnell shot a Taser into a target.

. A Taser M26 weighed 19.2 ounces, was 8.30 inches long (with a cartridge), 6.00 inches tall, and 1.75 inches wide. The Taser had yellow coloring on both sides and the back of the weapon and contained a laser sight and a battery light. A Glock .45 (similar to Purnell’s .40 caliber) weighed 38 ounces (with a magazine), was 7 .59 inches long, 5.47 inches tall, and 1.27 inches wide. The Glock was colored black and had no laser sight or lights. The holster straps of the two weapons were made of different materials.

. The district court also mused that "[p]erhaps ... Purnell's employer[] and/or the Taser manufacturer were negligent in not providing greater training,” but they "are not defendants in this action....” 559 F.Supp.2d at 652. The court disregarded the fact that Purnell "may not have complied with the [Sheriff's] Taser policy” and did not notice various physical differences between his weapons. Id. at 652 n. 3.

. In Graham v. Connor, the Supreme Court extended Garner and held "that all claims that law enforcement officers have used excessive force — deadly or not — in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its reasonableness standard, rather than a 'substantive due process' approach.” 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). See also Abney, 493 F.3d at 415 (citing Graham).

. Purnell stated in his deposition that he was concerned that because Henry was in his neighborhood, he could have run somewhere and picked up a weapon. However, that possibility did not make Henry an immediate threat. Purnell also testified that he did not know whether Henry was armed since he had not searched him. But Purnell had no reason to believe, or even suspect, that Henry was armed. When the dissent stresses Purnell’s personal hypotheses about what Henry might have done, dissenting op. at 544, it slips into the subjective and implies that all fleeing suspects may be apprehended through the use of deadly force. Gamer and Graham hold otherwise.

. Purnell claims that the firearm he previously carried, fourteen months before the day of the shooting, had a thumb safety. He claims that on the occasions when he trained with his Glock he noticed that he still made the same instinctive thumb motion that he used to make with his prior weapon. For that reason, he maintains that it was reasonable for him not to notice the lack of a thumb safety on his Glock. However, regardless of whether he continued to instinctually attempt to flip his thumb safety on his Glock, a reasonable officer would have noticed that he was not pushing anything with his thumb when he made that motion.

. Purnell admitted in his deposition that while he was never "told directly” during his Taser training, nonetheless "[i]t was implied” and "understood” that he should make sure he had drawn his Taser rather than his firearm before firing. J.A. 512.

. As we have noted, the Glock was completely black, while the Taser had yellow coloring on both sides. Also, the barrel of the Glock resembles a traditional handgun barrel, cylindrical and narrow, while the Taser’s "barrel” is box-shaped.

. It bears recognizing that at trial, of course, the jury will not be required to view the evidence in the light most favorable to Henry.

. The dissent avoids qualified immunity altogether by reasoning that "the Fourth Amendment does not address the accidental effects of otherwise lawful government conduct....” Dissenting op. at 548. That conclusion paraphrases Brower v. County of Inyo, but miscomprehends its legal import. 489 U.S. 593, 596, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989) (discussing “the accidental effects of otherwise lawful government conduct.”). Brower held that a police roadblock which accidentally killed a fleeing suspect constituted a seizure. Id. at 599, 109 S.Ct. 1378. Brower’s discussion of police intent, id. at 596-597, 109 S.Ct. 1378, stands for nothing more than the unremarkable proposition that intent can be a precondition for whether a Fourth Amendment seizure occurred in the first place, infra n. 15. Brower could have chosen to exempt all accidents from the Fourth Amendment. But instead, the Court remanded the case to con *534 sider if the roadblock was unreasonable and preserved the objective standard: "It may well be that [police] here preferred, and indeed earnestly hoped, that Brower would stop on his own, without striking the [roadblock], but we do not think it practicable to conduct such an inquiry into subjective intent.” 489 U.S. at 598, 109 S.Ct. 1378.
Moreover, the dissent itself concedes that "[n]one of the[] cases [it cites] involves the precise factual situation present here....” Dissenting op. at 547. For example, Milstead v. Kibler involved a bloody gun and knife fight where two men were wrestling and police shot the wrong one. 243 F.3d 157, 165 (4th Cir.2001). That reasonable reaction to a deadly threat is already constitutional under Gamer, but it differs markedly from the situation before us here.

. Of course, an officer's subjective intentions are quite relevant on the question of whether the officer "seized” the suspect within the meaning of the Fourth Amendment, but we resolved that question against Purnell in a prior appeal, see Henry v. Purnell, 501 F.3d 374, 381-82 (4th Cir.2007), and it is not now before us.

. There was briefly a time when qualified immunity included subjective factors, namely an officer’s "permissible intentions.” Wood v. Strickland, 420 U.S. 308, 322, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). But the Supreme Court soon eliminated subjective considerations altogether because "the subjective element of the good-faith defense frequently [had] proved incompatible with our admonition ... that insubstantial claims should not proceed to trial.” Harlow v. Fitzgerald, 457 U.S. 800, 815-816, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Specifically, Harlow reasoned that "judicial inquiry into subjective motivation therefore may entail broad-ranging discovery,” which would incur "substantial costs” and be "peculiarly disruptive of effective government.” Id. at 816-17, 102 S.Ct. 2727.

. We recognize of course that the substantive Fourth Amendment inquiry and the matter of qualified immunity are not always one and the same. See Saucier, 533 U.S. at 203-07, 121 S.Ct. 2151. Here, however, we think *537 qualified immunity was properly denied and that the reasonableness of the officer’s actions on the merits is a matter for the jury.