**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 15-1384**

JOTAYNUN LEE, Individually, and on behalf of himself and
the minor children of Jataynun Trayvon Fleming, Deceased,
and as Administrator of the Estate of Jataynun Trayvon
Fleming, Deceased,

Plaintiff - Appellant,

v.

TODD JAMES BEVINGTON,

Defendant - Appellee,

and

CITY OF RICHMOND, VIRGINIA; WESLEY E. MOORE; JOHN DOE, Nos.
1-20, being members of the Richmond Police Department SWAT
Team who responded to, and shot at the decedent at 304
Beaufort Hill Drive, Richmond, VA 23225; JOHN DOE, Nos. 11-
20, being United States Marshals Service members who were
part of the response team that shot at decedent,

Defendants.

Appeal from the United States District Court for the Eastern
District of Virginia, at Richmond.    Robert E. Payne, Senior
District Judge.  (3:12-cv-00471-REP)

Argued:  March 22, 2016                Decided:  May 5, 2016

Before NIEMEYER and MOTZ, Circuit Judges, and Max O. COGBURN,
Jr., United States District Judge for the Western District of
North Carolina, sitting by designation.

Affirmed by unpublished opinion. Judge Cogburn wrote the opinion, in which Judge Niemeyer and Judge Motz joined.

———————————

**ARGUED**: Kenechukwu C. Okoli, LAW OFFICES OF K.C. OKOLI, P.C., New York, New York, for Appellant. Donald Cameron Beck, Jr., MORRIS & MORRIS, P.C., Richmond, Virginia, for Appellee. **ON BRIEF**: John B. Mann, JOHN B. MANN, P.C., Richmond, Virginia, for Appellant. Antoinette Morgan Walker, MORRIS & MORRIS, P.C., Richmond, Virginia, for Appellee.

———————————

Unpublished opinions are not binding precedent in this circuit.

COGBURN, District Judge:

The Estate of Jataynun Trayvon Fleming ("Appellant" when referring to the estate, or "Fleming" when referring to the decedent) appeals an order of the district court granting summary judgment to Detective Todd James Bevington ("Bevington" or "Appellee") in this 42 U.S.C. § 1983 excessive force action. The district court determined that Bevington did not violate Fleming's Fourth Amendment rights when he used deadly force in seizing Fleming, and alternatively found that Bevington was entitled to summary judgment on his asserted qualified immunity defense. We affirm.

I.

We review a district court's grant of summary judgment de novo. Estate of Armstrong ex rel. Armstrong v. Vill. of Pinehurst, 810 F.3d 892, 895 (4th Cir. 2016). Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id. When ruling on a summary judgment motion, a court must view the evidence and any inferences from the

3

evidence in the light most favorable to the nonmoving party. F.D.I.C. v. Cashion, 720 F.3d 169, 173 (4th Cir. 2013). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). In the end, the question posed by a summary judgment motion is whether the evidence "is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 252.

"Because this is a deadly force case, 'the witness most likely to contradict [the officers'] story—the person shot dead—is unable to testify.'" Ingle ex rel. Estate of Ingle v. Yelton, 439 F.3d 191, 195 (4th Cir. 2006) (quoting Scott v. Henrich, 39 F.3d 912, 915 (9th Cir. 1994)). In such situations, "a court must undertake a fairly critical assessment of the forensic evidence, the officer's original reports or statements and the opinions of experts to decide whether the officer's testimony could reasonably be rejected at a trial," instead of merely accepting a potentially self-serving version of events relayed by the officers. Id. (citations omitted).

## II.

### A.

On July 14, 2010, officers of the Richmond Police Department ("RPD") arrived at Fleming's family home in Richmond,

Virginia, to execute a warrant for Fleming's arrest on charges of robbery and use of a firearm in the commission of a felony. Fleming was also suspected of being involved in a homicide and home invasion committed earlier that day. When police entered the residence, Fleming retreated and barricaded himself in an upstairs bathroom. Officers present on the scene reported that Fleming refused to exit the bathroom and repeatedly threatened to shoot the police officers.

After that initial interaction, the RPD officers dispatched a SWAT team to the residence; Bevington was a member of that SWAT team. The commander of the SWAT team, Lieutenant Mauricio Tovar ("Tovar"), communicated to the SWAT officers, including Bevington, the threats that Fleming had made to the RPD officers. Tovar also showed the SWAT officers Fleming's "wanted poster," which described Fleming as "armed and dangerous" and advised that he "[would] not go quietly." J.A. 357. The poster also included Tovar's handwritten notes describing communications he had received from RPD officers investigating the homicide. Those notes indicated that Fleming was possibly armed with a handgun and had made statements that he "will shoot" and was "not going down without a fight." J.A. 354. When Fleming's father, Jotaynun Lee ("Lee"), arrived at the residence and spoke with officers on the scene, he told the officers that Fleming did not have a gun.

5

After Tovar briefed Bevington and the other SWAT team members on the foregoing information, the SWAT team members staged themselves in a spare bedroom across the hall from the master bedroom, which connected with the bathroom where Fleming remained barricaded. Police negotiators deployed a "throw phone" into the bathroom, which allowed for audio communication between Fleming and negotiation officers, as well as video surveillance of the scene in the bathroom. The negotiation team informed Tovar that based on the video surveillance relayed through the throw phone, Fleming appeared to have a gun tucked into his waistband. Tovar communicated this fact to Bevington and other SWAT team members in the staging area. The negotiation team, using the throw phone, attempted to convince Fleming to peacefully surrender for several hours. In addition, throughout the course of the negotiations, Bevington repeatedly instructed Fleming on how to surrender, telling him to come out of the bathroom with his hands up.

While barricaded, Fleming communicated with police negotiators and members of the SWAT team, telling them he wanted to speak to his father and that he wanted a cigarette. At one point during the standoff, negotiators informed the SWAT team members that Fleming had asked what the SWAT officers would do if he "came out with his junk." J.A. 355, 365. SWAT officers, including Bevington, heard Fleming repeat this question from the

6

bathroom, yelling at the SWAT team, "What are you-all going to do when I come out with my junk? What are you going to do when I come out with my shit? You-all better get ready to kill me," and "you-all are going to have to shoot it out with me." J.A. 365, 751-52, 795. Officers interpreted "junk" to be a slang word for "gun" or "weapon."

After several hours, Fleming stopped responding to communications from the negotiators and began breathing heavily. Based on communications with the negotiators, Tovar determined that Fleming was preparing to exit the bathroom in a violent manner. Tovar then decided to fire tear gas into the master bathroom from outside the house in order to force Fleming to exit and surrender. In preparation for the tear gas deployment, Bevington and the other SWAT team members put on gas masks.

At the time the gas was deployed, Officer Wesley Moore ("Moore") was the first officer in the single-file SWAT line, kneeling and holding a ballistic shield. Bevington was stationed as the second officer in the team, standing directly behind Moore and providing "cover to a lethal threat." J.A. 368. Moore was positioned in the doorway of the spare bedroom; Bevington was leaning over the top of Moore, holding a rifle. The SWAT team members in line behind Moore and Bevington were also carrying rifles and service pistols; one carried a Taser to

7

deploy if necessary. The last two officers in line were part of the "arrest team" responsible for handcuffing Fleming.

Soon after the tear gas canisters were launched into the bathroom where Fleming was barricaded, Fleming exited the master bathroom,[1] moved into the master bedroom, and advanced toward the officers, who were waiting approximately 13 feet away in the threshold of the door to the spare bedroom across the hall.

Moore and Bevington both testified that when Fleming exited the master bathroom, his hands were outstretched toward the SWAT team. They both testified that Fleming was holding a black cylindrical object wrapped in some sort of cloth, and that they perceived this object as a gun. What Moore and Bevington thought was a gun was later determined to be a woman's high-heeled shoe wrapped in a t-shirt. As Fleming came toward the officers, Moore fired a single shot at him. Moore later testified that he shot because he feared for his life and thought that Fleming was going to shoot him or another member of the SWAT team.

Bevington testified that as Fleming came out of the bathroom and moved toward the officers, Moore shifted upwards a

---

[1] Appellant argues that a dispute of material fact exists as to how much time elapsed between the tear gas being thrown into the bathroom and Fleming running out of the bathroom. Moore stated at his deposition that only seconds elapsed; Sergeant Charles Hayes (another SWAT member) estimated that it took between three and seven minutes. Though disputed, this fact is not material to resolution of the excessive force question before us.

few inches, knocking Bevington's gun slightly. Bevington believed that the shot fired by Moore had come from Fleming. Bevington testified that after the first shot was fired, Fleming was still coming toward the officers with his hands straight out in front of him, holding what appeared to be a weapon. Bevington then fired several shots at Fleming.[2] Bevington testified that after he fired the first round of shots, Fleming fell to the ground but was still pointing his "weapon" at the officers and attempting to get back up as the officers approached. Moore also testified that after Fleming fell to the ground, he was still holding what appeared to be a weapon and was pointing it toward the officers. Bevington continued to fire until Fleming rolled over and Bevington could no longer see Fleming's hands. Bevington stated that the time between the first and second round of shots he fired was "less than seconds." J.A. 382. Moore and Bevington fired a total of nine rounds at Fleming, who was struck multiple times in his hands, arms, torso, and chest.

---

[2] Appellant argues that a genuine dispute of material fact exists as to Bevington's locations when Fleming exited the bathroom and when he was shot seconds later. The district court properly concluded that though a factual dispute existed as to Bevington's precise location at those times, resolution of those disputed facts was immaterial to the excessive force analysis. See Lee v. City of Richmond, Va., 100 F. Supp. 3d 528, 539–40 (E.D. Va. 2015) ("Whether Bevington was removed from Fleming by thirteen feet or ten feet or five feet makes no difference to the circumstances confronting the SWAT unit and Bevington as Fleming exited the bathroom and advanced toward the unit.").

When the shooting ceased, the two arresting officers handcuffed Fleming, removed him from the scene, and placed him in a waiting ambulance.[3] After being transported to a hospital, Fleming was pronounced dead within 30 minutes. Upon inspecting the scene after the shooting, officers did not find a gun. Photographs of the scene reveal a woman's high-heeled shoe and a blood-stained, light-colored t-shirt on the floor of the master bedroom.

Appellant argues that a genuine issue of material fact exists as to Fleming's location and positioning at the time he was shot. Appellant notes that during his interview three days after the shooting, Bevington told investigators he shot Fleming with a second round while Fleming was still on the ground and trying to get up, describing it as: "he's kind of laying toward us and he has this item in his hand still…what I believe was a gun and he tries to get up again." J.A. 553. Years later, at his deposition, he testified that he shot Fleming again while he was

---

[3] Appellant argues that a disputed issue of material fact exists as to who handcuffed Fleming after he was shot based on statements made by Lieutenant Stephen McQuail after the shooting and a declaration that he later signed in April 2013. See J.A. 1255; 1253 (explaining that multiple officers assisted in placing handcuffs on Fleming). In addition to finding no genuine factual dispute between the officer's statements, the issue of who handcuffed Fleming after the shooting is irrelevant to the inquiry before us.

on the ground, trying to get up, but still pointing what Bevington thought to be a weapon at the officers.

Moore testified that after he fired his shot, Fleming fell to the ground within a matter of seconds, and as Moore moved toward him, Fleming "was on his back kind of sitting up a little bit, and he had at least one hand pointed up, [and] I could see the weapon in his hand at that time." J.A. 786. When questioned as to whether he heard gunfire other than his own before Fleming fell to the ground, Moore testified, "when he was coming towards me, I fired the one round. That's all I heard. As we moved up, that's when I heard more gunshots. At that point…[h]e was kind of up, probably kind of leaning up…[h]e was laying down sideways with his weapon pointed up." J.A. 789. Moore reiterated that though Fleming was on the ground, he was still pointing what he believed to be a weapon at the SWAT team. At that point, Moore heard the shots that Bevington fired at Fleming.

To the extent that this testimony constitutes a factual discrepancy, we do not find it material to resolution of the matter at hand. Both Moore and Bevington testified that Fleming was attempting to get up, and either still had the "weapon" in his hand, or was actively pointing it at the officers, after Bevington fired the first volley of shots. As the district court properly found:

11

The second volley was fired a split-second after the first one, and, of course, Bevington, when he fired that volley, was informed by all the previously recounted facts just as he was when he fired the first volley. In addition, Bevington, as did Moore, saw that, although Fleming was down and wounded, he also was trying to get up and, in the process, he was still pointing at the police officers what was reasonably thought to be a gun. And, Bevington knew that the man pointing what he reasonably thought was a gun had threatened to kill the police officers. He then made a split-second reaction to fire the second volley at a man who was a threat to him and other officers and who was still resisting arrest. On the record here, whether Fleming was on the floor, or not, is not material to the determination whether…Bevington acted reasonably to the presented risk when firing the second volley.

Lee v. City of Richmond, Va., 100 F. Supp. 3d 528, 540 (E.D. Va. 2015).

As to the other alleged genuine issues of material fact raised by Appellant, addressed supra, we find that they are not truly disputed factual discrepancies, not material to resolution of the question before us, or merely facts that Appellant attempts to discredit in favor of his speculative version of events. As this court has previously noted,

In cases where officers are hurriedly called to the scene of a disturbance, the reasonableness of their response must be gauged against the reasonableness of their perceptions, not against what may later be found to have actually taken place. It will nearly always be the case that witnesses to a crime differ over what occurred. That inevitable confusion, however, need not signify a difference of triable fact. What matters is whether the officers acted reasonably upon the reports available to them and whether they undertook an objectively reasonable investigation with respect to

12

that information in light of the exigent circumstances they faced.

Gooden v. Howard Cty., Md., 954 F.2d 960, 965 (4th Cir. 1992). We find that none of the factual disputes raised by Appellant are triable issues that would ultimately affect the outcome of this case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Appellant also contends that two inferences should have been drawn in his favor at the summary judgment stage. First, based on the fact that Fleming emerged from a bathroom full of tear gas, Appellant asks the court to infer that Fleming's eyes were stinging and closed in response to the gas, and thus, that he must not have been able to see where he was going. Second, Appellant contends that the court should have inferred from the testimony of the officers, some of whom did not report to the investigators immediately after the shooting that they saw a shoe or cloth near Fleming, that the shoe and cloth were planted by one or more officers after the shooting but before the police crime scene unit took photographs of the scene. We find such inferences to be unsupported by the record and based wholly on speculation. While the court is cognizant of the fact that there is no testimony in this case from the one person who could have potentially contradicted the testimony of the officers—the decedent—there is simply no evidence in the record that would

13

allow us to make such inferences. Appellant's assertions essentially amount to a request for the court to doubt the testimony in this case and rely instead on unfounded conjecture. This we will not do. See Local Union 7107 v. Clinchfield Coal Co., 124 F.3d 639, 640 (4th Cir. 1997) ("Fanciful inferences and bald speculations of the sort no rational trier of fact would draw or engage in at trial need not be drawn or engaged in at summary judgment.").

## B.

Lee, in his capacity as the Administrator of Fleming's Estate, brought this § 1983 action in the Eastern District of Virginia, alleging that Bevington's actions constituted an unlawful seizure of Fleming's person under the Fourth Amendment.[4] The district court granted Bevington's Motion for Summary

---

[4] Appellant's Amended Complaint asserted three counts against Bevington and other officers. In addition to the Fourth Amendment excessive force claim asserted in Count I, Count II alleged that Bevington violated Lee's and Fleming's children's substantive due process rights by depriving them of their liberty interest "in the companionship, care, custody, and management" of Fleming. Count III alleged that Bevington caused Fleming "to suffer great pain, suffering and anguish" during the July 14, 2010 standoff and subsequent shooting. On March 27, 2013, the district court dismissed, pursuant to Fed. R. Civ. P. 12(b)(6), Counts II and III of the Amended Complaint, as well as Count I to the extent that it alleged claims on behalf of Lee individually and Fleming's minor children. Appellant's argument on appeal challenges only the district court's disposition of Count I on summary judgment, thus making the excessive force claim and related qualified immunity question the only issues before us on appeal.

Judgment on March 18, 2015, finding that Bevington was entitled to summary judgment on the merits of Appellant's excessive force claim and, accordingly, entitled to summary judgment on the basis of qualified immunity. This appeal followed.

III.

A.

"Qualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). "Officials will receive immunity unless the § 1983 claim satisfies a two-prong test: (1) the allegations, if true, substantiate a violation of a federal statutory or constitutional right and (2) the right was clearly established such that a reasonable person would have known his acts or omissions violated that right." Brockington v. Boykins, 637 F.3d 503, 506 (4th Cir. 2011) (citation and internal quotation marks omitted). The court may address these questions in either order, but Appellant's case will survive summary judgment "only if we answer both questions in the affirmative." Estate of Armstrong ex rel. Armstrong v. Vill. of Pinehurst, 810 F.3d 892, 898 (4th Cir. 2016) (citing Pearson v. Callahan, 555 U.S. 223, 232 (2009)). Here, considering the facts in the light most favorable to Appellant, Bevington's conduct did not violate Fleming's

15

constitutional rights and our inquiry thus ceases after resolving the first prong.

B.

Appellant alleges that Bevington violated Fleming's Fourth Amendment right to be free from unreasonable seizures—a right that extends to seizures accomplished by excessive force. See Graham v. Connor, 490 U.S. 386, 394 (U.S. 1989). "A claim that a police officer employed excessive force is analyzed under the Fourth Amendment under an 'objective reasonableness' standard." Smith v. Ray, 781 F.3d 95, 100-01 (4th Cir. 2015) (quoting Henry, 652 F.3d at 531). Excessive force does not arise if an officer's actions "are 'objectively reasonable' in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation." Id. (quoting Graham, 490 U.S. at 397). "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application…[but] requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Armstrong, 810 F.3d at 899 (internal citations and quotation marks omitted). Three factors guide us in this balancing: 1) the severity of the crime at issue; 2) the extent to which the suspect poses an immediate threat to the safety of the officers or others; and 3) whether the suspect is actively

16

resisting arrest or attempting to evade arrest by flight. Graham*,* 490 U.S. at 396. "Ultimately, the question to be decided is 'whether the totality of the circumstances justifie[s] a particular sort of ... seizure.'" Smith, 781 F.3d at 101 (quoting Tennessee v. Garner*,* 471 U.S. 1, 8–9 (1985)). This court has previously noted that, as opposed to considering an officer's actions piecemeal in a "segmented sequence of events," "[t]he better way to assess the objective reasonableness of force is to view it in full context, with an eye toward the proportionality of the force in light of all the circumstances." Id. at 101-02 (quoting Rowland v. Perry, 41 F.3d 167, 173 (4th Cir. 1994)). In addition, our determination of reasonableness must account "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97. As the district court noted,

> No citizen can fairly expect to draw a gun on police without risking tragic consequences. And no court can expect any human being to remain passive in the face of an active threat on his or her life…the Fourth Amendment does not require omniscience. Before employing deadly force, police must have sound reason to believe that the suspect poses a serious threat to their safety or the safety of others. Officers need not be absolutely sure, however, of the nature of the threat or the suspect's intent to cause them harm—the Constitution does not require that certitude precede the act of self protection.

17

<u>Lee v. City of Richmond, Va.</u>, 100 F. Supp. 3d 528, 542 (E.D. Va. 2015) (quoting <u>Elliott v. Leavitt</u>, 99 F.3d 640, 644 (4th Cir. 1996)).

Upon <u>de novo</u> review, we find that the totality of the circumstances here justifies the seizure that took place. As to the first <u>Graham</u> factor, the crime at issue was severe. Officers were attempting to arrest Fleming for his alleged involvement in a robbery accomplished by use of a firearm. The officers were also aware that Fleming was a suspect in a homicide committed earlier that day. The fact that Fleming was accused of committing such violent crimes weighs against Appellant.

As to the second <u>Graham</u> factor, the uncontroverted testimony indicates that the officers reasonably believed that Fleming posed an immediate threat to their safety. In addition to being aware of the fact that Fleming was wanted for violent crimes, the officers had been briefed on information from RPD indicating that Fleming was likely armed. They also received reports from the negotiation team that video surveillance revealed what appeared to be a weapon tucked into Fleming's waistband. Moreover, Fleming made overt threats to the SWAT team officers on the scene implying that he was armed. Once he emerged from the bathroom holding what appeared to be a weapon pointed at the officers, there existed a reasonable perception that Fleming posed an immediate risk to their safety. While it

18

was later determined that Fleming was not armed, he intentionally created the perception that he was. Fleming continued to point the apparent weapon at the officers even after Moore and Bevington fired their initial shots. These undisputed facts indicate that Bevington could reasonably have determined that Fleming posed a threat to his safety, as well as that of his fellow officers, over the course of the rapidly evolving and uncertain scenario that unraveled once Fleming came out of the bathroom.

The third factor—whether Fleming was actively resisting arrest—is also not favorable to Appellant. Fleming had been actively resisting arrest for several hours at the time he was shot. He chose to emerge from the bathroom creating the impression that he was capable of, and intent on, shooting the arresting officers instead of complying with their commands to peacefully surrender.

In sum, the totality of circumstances here is that Fleming was actively resisting arrest for violent felony charges, threatened and taunted the police with suggestions that they should be prepared to kill him, made statements directly to the officers implying that he was armed, and came out of the bathroom after a multiple-hour standoff with his hands outstretched toward the officers, pointing what appeared to be a weapon at them. The district court properly concluded that

19

considering the factual circumstances as a whole, "[n]o jury instructed on the applicable law could conclude that Bevington acted unreasonably in firing either the first or second volley" of shots. Lee, 100 F. Supp. 3d at 541. While the loss of life that occurred in the course of Fleming's attempted arrest is undeniably heartrending, the totality of circumstances here clearly justifies the actions by law enforcement that took place.

IV.

We have also considered Appellant's arguments about experts and find them to be either waived or abandoned. The "Statement of Issues" section of Appellant's brief raises as an issue for consideration on appeal whether the district court properly precluded the expert testimony of Dr. Kenneth Okafor. Appellant also stated in the "Summary of Argument" section of his brief that the district court improperly excluded such testimony. However, Appellant never addresses the issue further in his opening or reply brief, and made no mention of this issue at oral argument. An appellate brief "must contain appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies...." Fed. R. App. P. 28(a)(8). To that effect, the failure to raise or discuss an issue in an appellate brief renders that issue abandoned. See Mayfield v. Nat'l Ass'n for Stock Car Auto

<u>Racing, Inc.</u>, 674 F.3d 369, 376-77 (4th Cir. 2012). Because Appellant has failed to substantively argue the issue to the court, cite legal authority, or point out any particular part of the record relevant to his assertion regarding Dr. Okafor's testimony, we deem this issue abandoned.

In addition, though Appellant did not articulate in the "Statement of Issues" section of his brief any appellate issue related to Appellee's expert Matthew Nordel, he asserted in his "Summary of Argument" section that the district court erred by making a credibility determination as to this expert. We first note that the district court nowhere cited any testimony or opinion from Mr. Nordel in the decision now before us on appeal, and Appellant has failed to articulate where in the record the district court made any finding or reference related to him. It is thus unclear that the district court made a credibility determination as to this expert as Appellant claims. It is also unclear how any such determination could have affected the district court's decision on summary judgment. Moreover, Appellant has failed to cite any legal authority in support of his position on this issue. Thus, we need not consider this argument because it fails to comply with Fed. R. App. P. 28(a)(8). Even if the issue were properly before us, however, to the extent Appellant challenges Mr. Nordel's expert opinions as to the trajectories of bullets fired at Fleming, any facts

related to the distance and angle from which the bullets were fired would have no material impact on our analysis of the alleged constitutional violation at hand in light of the rest of the uncontroverted evidence discussed herein, even if such facts had been accepted by the district court.

## V.

Because Bevington's actions did not constitute an unlawful seizure in violation of Fleming's Fourth Amendment rights, we affirm the district court's decision granting Bevington's summary judgment motion.

AFFIRMED