**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 24-2131**

───────────

MELODY COOPER, Individually and as Personal Representative of the Estate of Kwamena Ocran,

Plaintiff – Appellee,

v.

OFFICER JAMES DOYLE; OFFICER KYLE KHUEN; SGT. WILLIE DELGADO; CPL. LARBI DAKKOUNI, Individually and in their official capacity as a Gaithersburg Police Officer,

Defendants – Appellants,

and

THE CITY OF GAITHERSBURG; UNKNOWN OFFICERS,

Defendants.

───────────

Appeal from the United States District Court for the District of Maryland, at Greenbelt. Deborah K. Chasanow, Senior District Judge.  (8:22-cv-00052-DKC)

───────────

Argued:  October 24, 2025                    Decided:  December 30, 2025

───────────

Before KING, RUSHING, and BENJAMIN, Circuit Judges.

───────────

Dismissed in part, affirmed in part, and remanded by published opinion.  Judge King wrote the opinion, in which Judge Benjamin joined.  Judge Rushing wrote a dissenting opinion.

---

**ARGUED:** Jason Levine, LOCAL GOVERNMENT INSURANCE TRUST, Hanover, Maryland, for Appellants.  Brian K. McDaniel, THE COCHRAN FIRM, CD/CRS, Washington, D.C., for Appellee. **ON BRIEF:** Raymond R. Mulera, William Dickerson, LOCAL GOVERNMENT INSURANCE TRUST, Hanover, Maryland; Kevin Karpinski, John Karpinski, KARPINSKI, CORNBROOKS, & KARP, Baltimore, Maryland, for Appellants.

---

KING, Circuit Judge:

This District of Maryland civil action arises from the January 2021 fatal shooting of 24-year-old Kwamane Ocran by officers of the Gaithersburg Police Department. Relevant here, plaintiff Melody Cooper, in her capacity as personal representative of Ocran's estate, has asserted a Fourth Amendment excessive force claim under 42 U.S.C. § 1983 against defendant police officers James Doyle, Kyle Khuen, Willie Delgado, and Larbi Dakkouni (collectively, the "Officers"). In July 2024, at the summary judgment stage of these proceedings, the district court denied the Officers qualified immunity with respect to the excessive force claim. *See Cooper v. Doyle*, No. 8:22-cv-00052 (D. Md. July 29, 2024), ECF No. 54 (the "Summary Judgment Ruling"). Thereafter, the court denied the Officers' motion for reconsideration of the Summary Judgment Ruling. *See Cooper v. Doyle*, No. 8:22-cv-00052 (D. Md. Oct. 16, 2024), ECF No. 59 (the "Reconsideration Ruling").

By this collateral order appeal, the Officers seek to challenge the Summary Judgment Ruling and the Reconsideration Ruling. As explained herein, we are constrained to dismiss the appeal in substantial part. More specifically, we dismiss to the extent the Officers prematurely and improperly seek to challenge the district court's various and several determinations that genuine disputes of material fact exist on the summary judgment record. Otherwise, we affirm the court's determination that — considering the undisputed facts — the Officers are not entitled to qualified immunity. And we remand for such other and further proceedings as may be appropriate, including a jury trial.

3

I.

A.

In January 2022, plaintiff Cooper — decedent Ocran's mother — initiated this civil lawsuit in the District of Maryland against the four Officers and several other defendants, alleging six claims for relief related to the 2021 police killing of Ocran. The sole claim of relevance in this collateral order appeal is the 42 U.S.C. § 1983 claim asserted against the Officers for use of excessive force, in violation of the Fourth Amendment.

1.

The evidence adduced in the underlying discovery proceedings reflects that, in January 2021, the four defendant Officers were members of the Street Crimes Unit ("SCU") of the Gaithersburg Police Department.[1] The SCU is a "plainclothes unit" that conducts investigations in areas such as firearms, narcotics, and fugitive operations. *See* J.A. 64.[2] Several years earlier, in 2016 and 2017, defendant Corporal Dakkouni had participated in an investigation of Ocran, which resulted in Ocran's arrest. Soon thereafter, Corporal Dakkouni began working with a "confidential informant" (the "CI").

In December 2020, the CI reached out to Corporal Dakkouni with information regarding Ocran. More specifically, the CI provided Dakkouni with information that Ocran

---

[1] As the district court was obliged to do, we must view the facts and all reasonable inferences drawn therefrom in the light most favorable to the plaintiff, as the nonmoving party. *See, e.g.*, *Aleman v. City of Charlotte*, 80 F.4th 264, 270 n.1 (4th Cir. 2023).

[2] Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties in this collateral order appeal.

had recently been released from prison, was in possession of a firearm, and was "looking to make a move." *See* J.A. 252. Upon verification that Ocran was actually a "prohibited possessor" of a handgun following his release from prison, an investigation was commenced with respect to Ocran by the SCU and Dakkouni. *Id.* at 256.

Several unsuccessful attempts were made by the SCU to locate Ocran in December 2020. Around that time, the CI advised Corporal Dakkouni that Ocran was staying with his girlfriend in the Chelsea Park Apartments in Gaithersburg, but that Ocran's residence was in the Silver Spring area of Maryland. That month, Dakkouni also asked the CI whether the CI could get Ocran to leave the Gaithersburg apartment, and the CI answered in the affirmative. In an exchange of text messages, Dakkouni asked the CI whether Ocran "sell[s]," and the CI thereupon responded, "[n]uh he a jack boy" with a "[g]un on him every[ ]where he go," and that he is a "[l]oose cannon." *See* J.A. 441.

In that same December 2020 conversation, the CI texted Corporal Dakkouni that Ocran "said he not going back to jail he will shoot it out." *See* J.A. 442. The CI also related that Ocran's "stick" had an "extension on it" which "[h]olds hella shells." *Id.* Dakkouni then asked the CI if there were any pictures of Ocran. The CI responded with a picture of a person's hand grasping a handgun and the message "[t]hat's it," as well as a social media page with a photo of Ocran. *Id.* at 443. Furthermore, Dakkouni asked the CI whether Ocran is a "shooter," to which the CI rejoined, "He claims." *Id.* at 444.

Later in December 2020, Corporal Dakkouni informed defendant Officers Doyle and Khuen that Ocran was carrying firearms, that Ocran was a prohibited possessor of

5

firearms, and that the information had come from a credible source (i.e., the CI). Khuen then participated in the initial investigation by monitoring Ocran's social media accounts.

On January 8, 2021, the CI informed Corporal Dakkouni that Ocran was in possession of a handgun that he was going to attempt to sell in the parking lot of the Chelsea Park Apartments in Gaithersburg. The CI also reported that the CI was meeting Ocran — at Ocran's request — because Ocran wanted the CI to be present when Ocran sold the weapon. Dakkouni thereupon contacted the SCU, requesting that a team of officers arrive to work early that same day to initiate surveillance on Ocran. Dakkouni also apprised his superior officer, defendant Sergeant Delgado, of these developments.

Officers Doyle and Khuen promptly responded to Corporal Dakkouni's request and began undercover surveillance at the Chelsea Park Apartments around 1:00 p.m. on January 8, 2021. At approximately 2:00 p.m., Sergeant Delgado joined the ongoing surveillance effort. At all relevant times, Dakkouni remained in contact with the CI. Notably, as members of the "plainclothes" SCU unit, the Officers carried their badges but they otherwise were not in uniform and conducted surveillance from unmarked covert vehicles.

Initially, the Officers planned to allow the illegal handgun purchase to transpire under surveillance, follow the purported buyer and do a "stop" or "takedown," and then later return with an arrest and search warrant for Ocran. *See* J.A. 97, 276. The CI, however, soon informed Corporal Dakkouni that the firearm sale was not going to take place that day. As a result of the expected sale being cancelled, the Officers resolved to surveil Ocran once he left the apartment, with the intention of interdicting Ocran in a safe location.

6

Throughout the afternoon and into the evening hours of January 8, 2021, Corporal Dakkouni and the CI continued to exchange text messages, in which they discussed Ocran's plans and location. In that particular exchange, the CI denied knowing precisely which apartment Ocran was in at the Chelsea Park Apartments, although the CI eventually identified the building and provided Dakkouni with directions to the door. The CI requested that the police not enter the apartment unit because Ocran's girlfriend — with whom the CI had a close relationship — was also present. Eventually, the CI confirmed to Dakkouni that Ocran was leaving the apartment to go to a nearby International House of Pancakes ("IHOP") and that Ocran was in possession of his handgun. *See* J.A. 326.

Upon observing Ocran leave the apartment building with the CI, the Officers followed the two men as they walked to a nearby shopping center where the IHOP was located. Officer Khuen observed Ocran and the CI part ways shortly after arriving at the shopping center. Around that time, Sergeant Delgado could no longer see Ocran and asked his colleagues if Ocran was displaying any mannerisms consistent with someone carrying a handgun. The Officers responded affirmatively, noting that Ocran was guarding his waistband, placing his hand in his waistband, and looking around. After Ocran and the CI parted ways, the Officers followed Ocran back towards the Chelsea Park Apartments. The Officers then resolved to stop Ocran before he reached those apartments. According to Corporal Dakkouni, Ocran's movements as he returned to the apartments were consistent with someone holding a gun in his waistband. Eventually, each of the Officers returned to

7

the parking lot area by the apartments.  By that point in the evening, it was dark outside, although the parking lot area was illuminated by streetlights and lights from the buildings.

2.

In depositions conducted in the discovery proceedings, the Officers each recounted his version of the events surrounding the fatal shooting of Ocran that evening of January 8, 2021.  According to Officer Khuen, upon seeing Ocran outside of the Chelsea Park Apartments, he displayed his police badge, shined his flashlight on Ocran, and stated, "[P]olice, I need to talk to you."  *See* J.A. 101.  Khuen related that Ocran responded, "[O]h fuck," grabbed his waistband, and began to run.  *Id.*  Khuen described the ensuing chase:

> Q:  And how far away from Ocran were you at the time that you started chasing him?
>
> A:  I want to say four or five feet.
>
> Q:  And what do you recall observing at that time?
>
> A:  As I was chasing him through . . . the grass median in the parking lot right in front of where my car was parked, Corporal Dakkouni was running around the other side of the parking lot to try to cut him off. We're yelling police, stop running . . . I heard Corporal Dakkouni say don't grab for the gun, don't grab for the gun. Police, stop running. And at that point I could see Ocran turned with his body like this, extending his arm out towards us and I just see a muzzle flash.
>
> Q:  And when you saw the muzzle flash, were you able to — did you hear anything at that time?
>
> A:  No, sir.
>
> Q:  And how far away were you from Mr. Ocran at that time?
>
> A:  I believe it was like five feet, something like that.

8

Q:  Where was Corporal Dakkouni at that time, at the time that you say you saw this muzzle flash?

A:  He was slightly in front of me.  To my recollection he was right in front of me to the left.

Q:  Okay. Was he closer to Mr. Ocran than you?

A:  Yes, sir, he was.

Q:  And was Mr. Ocran running away from you at that time?

A: Yes, sir.

*  *  *

Q:  Okay. When you saw this muzzle flash, what did you do?

A:  I took my radio and threw it into my left hand, drew my firearm and started firing at Mr. Ocran.

Q:  How many times did you fire?

A:  I believe it was six.

*Id.* at 102-04.

According to Sergeant Delgado's deposition version of the events, Officer Khuen had passed Ocran before turning around, identifying himself as "police," and asking Ocran if they could talk.  From approximately 15 yards away, Delgado observed that Khuen was wearing a badge around his neck and holding a flashlight.  According to Delgado, Ocran said, "Oh, shit," and began running away from Khuen.  *See* J.A. 192.  Delgado related that he then started chasing Ocran and caught up with Corporal Dakkouni and Khuen, who were in front of Delgado to his left, and Officer Doyle, who was to his right.  As Delgado explained in his deposition, Ocran and the other officers made a right turn between the

9

"Jersey wall" and the apartment building. *Id.* at 195. Delgado likewise testified that, during the chase, Ocran looked to his right and left, and, based on the height of Ocran's right elbow as he ran away from the officers, Delgado inferred that he was reaching into his waistband. According to Delgado, he was about 12 to 15 feet behind Ocran at that time. Delgado further testified that Dakkouni yelled at Ocran, "Don't do it. Don't do it. No, no, no." *Id.* at 196. As Delgado would later recall during his deposition:

A: I saw a muzzle flash from the center of all officers.

Q: So were you and Corporal Dakkouni and Officer Doyle and Officer Khuen running in a straight line, or were you all kind of spread out?

A: We were spread out.

Q: And this muzzle flash you say you're certain came from Mr. Ocran; is that right?

A: It was in the middle, yes.

Q: When you say it was in the middle, what does that mean?

A: Mr. Ocran was in the middle. I said Corporal Dakkouni and Officer Khuen were to my left, [Officer Doyle] was to my right. Directly in front of me was Mr. Ocran.

Q: Okay.

A: The muzzle flash came from the middle.

* * *

Q: Did you hear a gun fire at the time that you say that you saw this muzzle flash?

A: No.

10

Q: And you — at that point in time, when you say you saw this muzzle flash, would you say you were . . . about 12 feet away from him?

A: Approximately, yes.

Q: And so what did you do after that?

A: I drew my firearm.

Q: What did you do after that?

A: Fired.

Q: Okay. What were you firing at?

A: Mr. Ocran.

Q: Okay. Were you the first officer to fire at Mr. Ocran?

A: No.

Q: How long after you saw the muzzle flash was it that you began to fire?

A: Almost immediately.

Q: . . . Did you see any other members of your team draw their weapons and fire before you?

A: I heard gunfire before me, but I didn't see them draw, aim. I heard gunfire.

*Id.* at 196-99. According to Delgado's testimony, he then proceeded to fire two shots at Ocran, as Ocran was supposedly standing with his body angled toward the officers and with his right hand stretching out. Delgado related that Ocran was pointing the firearm in the direction of Doyle. Delgado further testified that he fired his weapon at Ocran because he was in fear of imminent bodily harm to himself or the other Officers.

11

Meanwhile, Corporal Dakkouni testified in his deposition that, when confronted by Officer Khuen, Ocran had one hand in his waistband. According to Dakkouni, Ocran said, "Oh, shit," and started running away. *See* J.A. 334. Dakkouni testified that he had jogged to get closer as Khuen made his approach, and then beelined toward Ocran once Ocran began to flee. Dakkouni related that Khuen was closest to Ocran when the foot chase began, while Dakkouni was approximately 15 feet from Ocran. Furthermore, Dakkouni testified that he passed Khuen, came up directly behind Ocran, and screamed, "Police. Police. Let me see your hands. Stop reaching in your waistband," and "Police. Stop running. Stop reaching. Don't do it, don't do it." *Id.* at 338. According to Dakkouni, Ocran continued to run with both hands near his waistband, and he looked backward to his right twice, gazing toward Dakkouni. Dakkouni recalled that he did not see whether Ocran was holding a handgun, but he believed that Ocran was armed based on the CI's information, Ocran's mannerisms, and his experience and training as a police officer.

Additionally, Corporal Dakkouni elaborated that, during the foot pursuit, he changed his position in relation to Ocran, a maneuver described as "getting off the X." *See* J.A. 338. When Ocran looked back a third time, Dakkouni saw a muzzle flash. Dakkouni said that he did not hear anything at the time he saw the muzzle flash, and that he was unaware of any officers being struck by a bullet. After he saw the muzzle flash, however, Dakkouni related that he immediately fired at Ocran from approximately seven feet away.

Meanwhile, Officer Doyle testified that, as Officer Khuen initially contacted Ocran, Ocran dug his right arm deeper into his coat pocket area, held down on his jacket pocket,

12

and started to run away from Khuen through the parking lot. Doyle related that he did not see a firearm in Ocran's possession. According to Doyle, he began pursuing Ocran. Doyle described being behind Khuen but in front of Sergeant Delgado. Doyle recounted the Officers saying "stop" multiple times, as well as Ocran turning the corner and looking back towards them three times. *See* J.A. 419. In Doyle's accounting of the events, Ocran turned his body, and Doyle saw a firearm in Ocran's hand. Doyle thereupon related that he went to grab his weapon, but his jacket was caught in his holster, so he looked down. At that point, Doyle claimed, he heard a shot fired while he was looking down but did not see a flash. Doyle testified that he believed the shot was fired in his direction based on his experience both in the military and as a police officer. Doyle recounted that he drew his firearm, saw Ocran's hand coming back out, and proceeded to fire at Ocran.

3.

In the aftermath of the fatal police shooting that took Ocran's life, the Montgomery County Police Department commenced an investigation, which was supervised by the Howard County State's Attorney's Office. As part of that investigation, the four defendant Officers were each interviewed, and video and forensic evidence from the scene was reviewed. That investigation determined that the Officers had fired 27 rounds at Ocran — 23 shell casings of which were collected at the scene. Specifically, the investigation determined that Sergeant Delgado had fired one round; Officer Khuen had fired six rounds; Officer Doyle had fired eight rounds; and Corporal Dakkouni had fired 12 rounds.

13

The investigation also established that a Hi-Point 9mm handgun, with one round in the chamber and three additional rounds in the magazine, was recovered from the area near Ocran's right hand. According to the investigators, no shell casings or projectiles were recovered from the Hi-Point 9mm handgun. The investigation revealed there were no non-law enforcement witnesses to the police shooting, although some nearby witnesses had heard the shots, heard someone yelling, and saw the Officers pursuing Ocran on foot.

Additionally, a postmortem examination was conducted as part of the investigation into Ocran's death and an autopsy report was issued. *See* J.A. 484-495 (the "autopsy report"). The autopsy report revealed that Ocran's death was ruled a "HOMICIDE" caused by "Multiple . . . Gunshot Wounds." *Id.* at 493-94. Of the eight gunshot wounds that had been found in Ocran's body, seven had a wound path from back to front (indicating that Ocran was shot in the back), while one had an "indeterminate" path. *Id.* at 490.[3]

4.

The plaintiff also retained an expert — Dr. Tyrone Powers — who provided a 33-page analysis and assessment of liability. *See* J.A. 497-529. Therein, Dr. Powers concluded

---

[3] We observe that the investigators also tested Ocran's winter coat for gunshot residue, along with the plastic bags that had been used to cover his hands during the postmortem examination. Particles characteristic of gunshot residue were found on the right cuff and sleeve of Ocran's coat. Moreover, one particle characteristic of gunshot residue was found on the bag covering Ocran's left hand, but no gunshot residue particles were found on the bag covering Ocran's right hand. Meanwhile, according to DNA testing of the firearm that had been recovered by the Officers next to Ocran's body, there was "very strong support for Kwamena Ocran to be included as a contributor to the mixed DNA profile obtained from" the grip and slide of the firearm. *See* J.A. 448.

14

that the force used by the Officers "was not [objectively] reasonable and [was] inconsistent with accepted standards of police practices, polices and training for [Corporal] Dakkouni and members of the . . . [SCU] to shoot . . . Ocran." *Id.* at 528. Powers also opined that "[t]he use of force used against . . . Ocran was excessive and unjustified; it[] was not objectively reasonable, was unreasonable, disproportional, and unnecessary." *Id.*

5.

It was further revealed in discovery that, within a week after the fatal shooting of Ocran on January 8, 2021 — and before speaking to the investigators from the Montgomery County Police Department and the Howard County State's Attorney's Office — the Officers had convened at Sergeant Delgado's house to bring their "families together so that [they] were in this together and ma[k]e sure that everybody was okay." *See* J.A. 400. Specifically, the Officers met on at least two occasions after the shooting. According to Officer Khuen's deposition testimony, the Officers did not talk about the shooting, but "just check[ed] on each other to make sure each other was okay." *Id.* at 75. Meanwhile, Delgado testified that the Officers "talked about how tragic [the shooting] was." *Id.* at 204. In his deposition, Corporal Dakkouni related that the Officers did not talk about this lawsuit. And according to Officer Doyle, the Officers did not discuss the case "except for saying that it was a tragic event and making sure that everybody was okay." *Id.* at 401.[4]

---

[4] Officer Khuen recounted calling Sergeant Delgado and Corporal Dakkouni shortly after their depositions in this litigation, apparently to ask them how they were doing. Officer Doyle also testified that he called Delgado shortly after his deposition to "make sure that he was good after giving his account at the deposition." *See* J.A. 426 (Officer (Continued)

B.

Following the close of discovery, in October 2023, the Officers moved for summary judgment on, inter alia, the plaintiff's Fourth Amendment excessive force claim. Along with their summary judgment motion, the Officers included four proposed exhibits of video recordings related to the shooting incident. These recordings included parking lot security camera footage from the Chelsea Park Apartments, a cell phone video taken from inside that apartment complex, and footage from two body-worn cameras of the Officers.[5]

In their summary judgment memorandum, the Officers readily acknowledged the two prongs of the qualified immunity analysis. *See Cooper v. Doyle*, No. 8:22-cv-00052, at 19-20 (D. Md. Oct. 13, 2023), ECF No. 44-1 (citing *Saucier v. Katz*, 533 U.S. 194 (2001), for proposition that assessment of qualified immunity follows two-step approach). First and primarily, the Officers maintained that no Fourth Amendment violation occurred because they had been confronted with "the imminent threat of death or serious bodily injury," such that their use of force against Ocran was objectively reasonable. *Id.* at 14. Next, the Officers thus asserted that "[a]t the risk of stating the obvious, there is no need for [the district court] to weigh the second prong of the [qualified immunity] framework." *Id.* at 20. The Officers then summarily declared — without citation to any controlling or

Doyle: "I will say this, it was not about the deposition, but I wanted to make sure that he was good after giving his account at the deposition, if that makes any sense").

[5] We observe that the district court granted the Officers leave to file the video recordings as exhibits, finding that "[g]ood cause exists to permit the filings" for consideration at the summary judgment stage. *See* Summary Judgment Ruling 19.

16

persuasive authority — that "even if [the court] did so, the analysis must conclude that there was no clearly established right [for Ocran] to point a handgun at law enforcement while fleeing, let alone to discharge the weapon in the Officers' direction." *Id.*

In response, the plaintiff contended that the Officers' use of deadly force was not objectively reasonable under the Fourth Amendment and that the Officers were not entitled to qualified immunity. *See Cooper v. Doyle*, No. 8:22-cv-00052 (Nov. 20, 2023), ECF No. 51-1.[6] As to the first prong of the qualified immunity analysis, the plaintiff maintained that "there are facts in material dispute as to the violation of . . . Ocran's Fourth Amendment rights," and that "[t]he facts here, when viewed in the light most favorable to the [p]laintiff, showed that . . . Ocran . . . at worst possessed a firearm and ran from the police, but there are disputes as to whether he drew, pointed and fired the firearm at the [O]fficers." *Id.* at 8. Meanwhile, as to the second prong — i.e., whether the constitutional right at issue was clearly established at the time of violation in January 2021 — the plaintiff emphasized that "[t]he [Officers] bear[] the burden of proof." *Id.* On that score, the plaintiff maintained that the Officers failed to demonstrate that the Fourth Amendment right at issue was not clearly established in January 2021, in that they "were on notice that they were not allowed to shoot an armed person who is not threatening them or any other person, and not presenting an imminent threat of death or serious harm to them." *Id.* at 9.

---

[6] The plaintiff also sought leave to file an audio recording as an exhibit to her response in opposition to the Officers' summary judgment motion. The district court granted such leave for the same reasons that it granted the Officers' request to file certain video recordings along with their summary judgment motion. *See supra* note 5.

C.

By its Summary Judgment Ruling of July 2024, the district court denied the

Officers' motion for summary judgment with respect to the plaintiff's Fourth Amendment

excessive force claim. The court initially concluded that, pursuant to the Supreme Court's

decision in *Graham v. Connor*, 490 U.S. 386 (1989), summary judgment is inappropriate

on this record.[7] According to the Summary Judgment Ruling, because the Officers had

"killed the only other potential witness," the court "'avoid[ed] simply accepting an officer's

self-serving statements and . . . consider[ed] all contradictory evidence.'" *See* Summary

Judgment Ruling 21-22 (quoting *Stanton v. Elliott*, 25 F.4th 227, 233 (4th Cir. 2022)).

Rather, after carefully considering the parties' respective contentions and the evidence

adduced in discovery, the Summary Judgment Ruling concluded as follows:

> [A] reasonable jury could credit the [O]fficers' testimony and determine that
> . . . Ocran pointed his firearm, and perhaps also fired a shot, at [the] Officers.
> On the other hand, a reasonable jury could conclude, based on the evidence
> that . . . Ocran was shot in the back while fleeing, that . . . Ocran never turned
> around to point a gun at [the] Officers. A reasonable jury could also
> conclude, based on the facts that no cartridge casings from . . . Ocran's
> firearm were recovered on the scene and no officers were shot, that . . . Ocran
> never fired a shot. If . . . Ocran never pointed or fired his firearm, and merely
> fled the officers, even while armed, then a jury could conclude that an officer
> would not have reasonably believed that . . . Ocran posed an immediate threat
> to the [O]fficer's safety or the safety of anyone else. Because genuine
> disputes of material fact remain as to whether . . . Ocran pointed and fired his

---

[7] We observe that, pursuant to *Graham*, a court must employ a standard of "objective reasonableness" in evaluating a Fourth Amendment excessive force claim. *See* 490 U.S. at 399. And the three factors to be considered in applying the objective reasonableness standard are: (1) "the severity of the crime at issue"; (2) "whether the suspect poses an immediate threat to the safety of the officers or others"; and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

firearm, [the Officers] are not entitled to summary judgment on [p]laintiff's Fourth Amendment claim.

*Id.* at 32-33.[8]

Moving on, the district court specifically considered whether the Officers are entitled to qualified immunity. Against a backdrop of familiar legal principles pertaining to qualified immunity, the Summary Judgment Ruling initially observed that "the court has already determined under the first prong that a reasonable jury could conclude that [the] Officers violated . . . Ocran's Fourth Amendment rights[.]" *See* Summary Judgment Ruling 35 (citing *Stanton*, 25 F.4th at 233). From there, the Summary Judgment Ruling assessed whether the Fourth Amendment right at issue was "clearly established," based on the undisputed facts viewed in the light most favorable to the plaintiff. *Id.*

On that question, the Summary Judgment Ruling observed that, although the Officers "bear the burden on the second prong of the qualified immunity analysis," they "identified no authorities holding that such a right was not clearly established." *See* Summary Judgment Ruling 35. Moreover, the Summary Judgment Ruling determined that "the right not to be shot in the back while fleeing officers when the officers suspected that the individual was armed but the individual never pointed a firearm at the officers was clearly established on January 8, 2021." *Id.* at 36 (citing *Henry v. Purnell*, 652 F.3d 524,

---

[8] The Summary Judgment Ruling also specifically determined that "a reasonable jury could conclude that [the] Officers communicated with each other [after the shooting] to ensure that their testimony was consistent." *See* Summary Judgment Ruling 28. Strikingly, the Officers ignore that determination in their appellate arguments.

534 (4th Cir. 2011) (en banc)). Consequently, the Summary Judgment Ruling concluded that the Officers had not established that they are entitled to qualified immunity.

## D.

Shortly thereafter, in August 2024, the Officers moved for reconsideration of the Summary Judgment Ruling. In their motion, the Officers maintained that the Summary Judgment Ruling "gave undue weight to speculative inferences which are unwarranted on this record, while discounting in an extraordinary manner the abundant evidence supporting the [Officers'] position." *See Cooper v. Doyle*, No. 8:22-cv-00052, at 2 (D. Md. Aug. 9, 2024), ECF No. 56. According to the Officers, summary judgment should have been awarded in their favor on the plaintiff's excessive force claim because there is no genuine dispute of material fact as to the "objectively reasonable nature of the . . . Officers' conduct." *Id.* at 13. Of import, the Officers did not raise any argument as to the Summary Judgment Ruling's earlier determination that the Officers are not entitled to qualified immunity, nor did they address the "clearly established" prong of that analysis.

By its Reconsideration Ruling of October 2024, the district court readily denied the Officers' request that the court reconsider the Summary Judgment Ruling. Therein, the court thoroughly and cogently explained that "there is a genuine dispute of material fact" on the issue of whether "Ocran pointed a firearm at [the] Officers," along with the issue of whether Ocran "fired a firearm" at the Officers. *See* Reconsideration Ruling 6.

\* \* \*

20

The Officers timely noted this interlocutory appeal on October 24, 2024, seeking to challenge both the Summary Judgment Ruling and the Reconsideration Ruling. The Officers have invoked this Court's jurisdiction to review those rulings pursuant to the collateral order doctrine. *See Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985).

II.

We review de novo district court decisions on motions for summary judgment and qualified immunity. *See Aleman v. City of Charlotte*, 80 F.4th 264, 283 (4th Cir. 2023). Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). In that regard, the Supreme Court has said that a fact is material if it "might affect the outcome of the suit under the governing law," and that a genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Significantly, a denial of summary judgment is generally not appealable under 28 U.S.C. § 1291, which authorizes appeals only from final decisions of a district court. Pursuant to the collateral order doctrine, however, "a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291," despite "the absence of a final judgment." *See Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). In a collateral order appeal, "an appellate court can . . . decide purely legal questions relating to qualified immunity."

21

*See Witt v. W. Va. State Police, Troop 2*, 633 F.3d 272, 275 (4th Cir. 2011) (citation modified). An appellate court assessing such an appeal, however, cannot "reweigh the record evidence to determine whether material factual disputes preclude summary disposition." *Id.* (citation modified). Thus, in exercising collateral order jurisdiction, we must "examine the parties' appellate arguments to ensure that we only consider those legal questions formally raised on appeal." *See Iko v. Shreve*, 535 F.3d 225, 235 (4th Cir. 2008).

## III.

In this collateral order appeal, the Officers primarily maintain that the district court erred in "determining that material disputes of fact forestalled a finding that the officers reasonably employed deadly force" against Ocran. *See* Br. of Appellants 20. For example, the Officers contend that the court "mischaracterized whether Ocran pointed the gun at the officers and fired it as 'material' disputes of fact." *Id.* As the Officers would have it, the court's erroneous determination of genuine disputes of material fact infected its ruling on each prong of the qualified immunity analysis. Alternatively, the Officers argue that even accepting the court's version of the undisputed facts, "the right at issue was not clearly established" at the time the constitutional violation had occurred in January 2021. *Id.* We assess — and reject — each of the Officers' appellate contentions.

22

A.

We begin with the Officers' contention that the district court erroneously identified genuine disputes of material fact. Simply put, we lack collateral order jurisdiction to review this contention, such that we must dismiss the Officers' appeal in substantial part.

As our en banc Court has recognized, we may properly exercise jurisdiction "over a claim that there was no violation of clearly established law *accepting the facts as the district court viewed them*." *See Winfield v. Bass*, 106 F.3d 525, 530 (4th Cir. 1997) (en banc) (emphasis added). Writing for our en banc Court in 1997, Judge Wilkins explained that, in the context of an interlocutory appeal from a denial of qualified immunity, "we possess no jurisdiction over a claim [interposed by the defendants] that a plaintiff has not presented enough evidence to prove that the plaintiff's version of the events actually occurred." *See Winfield*, 106 F.3d at 530 (citing, inter alia, *Johnson v. Jones*, 515 U.S. 304 (1995)). Not only that, but "to the extent that the appealing official seeks to argue the insufficiency of the evidence to raise a genuine issue of material fact — for example, that the evidence presented was insufficient to support a conclusion that the official engaged in the particular conduct alleged — we do not possess jurisdiction . . . to consider the claim and, therefore, may not do so absent some independent jurisdictional base." *Id.* at 529-30.

We therefore lack jurisdiction to consider the Officers' numerous challenges to the district court's determinations — set forth in the Summary Judgment and Reconsideration Rulings — that genuine disputes of material fact exist on this record. *See Winfield*, 106 F.3d at 530; *see also Johnson*, 515 U.S. at 314. As such, we cannot review the court's

23

determinations that a reasonable jury could conclude (1) that "Ocran never fired a shot" at the Officers; (2) that "Ocran never pointed a handgun at [the Officers]"; (3) that Ocran never "reached into his waistband"; (4) that "Ocran was shot in the back while fleeing"; and (5) that Ocran never "posed an immediate threat to the [O]fficers' safety or the safety of anyone else." *See* Summary Judgment Ruling 29-33. These disputed issues of material fact — which the court declined to revisit in its Reconsideration Ruling — are for a jury to assess. And they simply are not properly before us in this collateral order appeal.

B.

We turn to the "legal issue of whether the *undisputed facts* disclose that reasonable officers would have understood that their conduct violated [Ocran's] clearly established legal rights." *See Winfield*, 106 F.3d at 530 (emphasis added). As explained below, to the extent the Officers have fairly challenged the district court's specific legal conclusions independent of any factual disputes, we agree with the court that Ocran's Fourth Amendment rights were clearly established at the time of violation in January 2021.

1.

Section 1983 of Title 42 "creates a cause of action against any person who, acting under color of state law, abridges a right arising under the Constitution or laws of the United States." *See Cooper v. Sheehan*, 735 F.3d 153, 158 (4th Cir. 2013); *see also Aleman v. City of Charlotte*, 80 F.4th 264, 284 (4th Cir. 2023). Law enforcement officers sued in their individual capacities under § 1983 may invoke the doctrine of qualified immunity, which shields "government officials from liability for civil damages insofar as their conduct does

24

not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation modified). Qualified immunity is designed to "protect[] law enforcement officers from bad guesses in gray areas and ensures that they are liable only for transgressing bright lines." *See Willingham v. Crooke*, 412 F.3d 553, 558 (4th Cir. 2005) (citation modified).

As the district court properly recognized in its Summary Judgment Ruling, the qualified immunity analysis consists of two prongs: (1) whether a statutory or constitutional violation occurred, and (2) whether the right was clearly established at the time of the violation. *See Mays v. Sprinkle*, 992 F.3d 295, 301 (4th Cir. 2021) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). If the answer to either question is "no," the officer being sued is entitled to qualified immunity. *See Pearson*, 555 U.S. at 232. To that end, the courts possess discretion in deciding which prong to address first. *Id.* at 236. In reviewing qualified immunity at the summary judgment stage, our job is to "consider whether there are any material disputes of fact . . . that, when resolved, would amount to the violation of a clearly established constitutional right." *See Stanton v. Elliott*, 25 F.4th 227, 234 (4th Cir. 2022). "If there are, summary judgment is inappropriate." *Id.*

With respect to the second prong of the qualified immunity analysis — that is, whether a constitutional right was clearly established — we look to decisions of the Supreme Court and our Court to "consider whether officers within our jurisdiction have been provided fair warning, with sufficient specificity, that their actions would constitute a deprivation of an individual's constitutional rights." *See Betton v. Beleu*, 942 F.3d 184,

193-94 (4th Cir. 2019). As the Supreme Court recently explained in this context, "[i]t is not enough that a rule be suggested by then-existing precedent; the rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *See City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021) (citation modified). Nevertheless, "[a] right need not be recognized by a court in a specific factual context before such right may be considered 'clearly established' for purposes of qualified immunity." *See Wilson v. Prince George's Cnty.*, 893 F.3d 213, 221 (4th Cir. 2018).

Finally — and of especial relevance here — our Court has observed that, even if "there is no case directly on point factually to inform our [clearly established] analysis," a right can nevertheless be clearly established if the "core constitutional principles set forth in numerous cases lead us to the conclusion that [a plaintiff's] substantive due process right was clearly established" at the time of the constitutional violation. *See Dean ex rel. Harkness v. McKinney*, 976 F.3d 407, 418 (4th Cir. 2020). In other words, our Court has recognized that "clearly established law encompasses 'not only specifically adjudicated rights, but also those manifestly included within more general applications of the core constitutional principles invoked.'" *See Williamson v. Stirling*, 912 F.3d 154, 187 (4th Cir. 2018) (quoting *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 538 (4th Cir. 2017)).

2.

Against this backdrop, the Officers maintain that the district court erred in concluding that the Officers violated Ocran's clearly established Fourth Amendment right to be free from excessive force. The Officers first assert that "the relevant constitutional

26

right is properly defined as the right to make furtive movements and disobey an officer's commands while fleeing from law enforcement on foot with a firearm." *See* Br. of Appellants 46. That particular right, the Officers say, is "not clearly established." *Id.*

There is an immediately fatal problem with the Officers' position. Specifically, the premise of the Officers' argument rests on facts that the district court deemed to be in dispute — that is, whether Ocran made any furtive movement while fleeing from the Officers. *See* Summary Judgment Ruling 29 n.6 (recognizing that "Ocran may have reached into his waistband when not captured by the security camera, as [the] Officers testified, but the court must be careful not to accept such self-serving statements when . . . [the] Officers killed the only other potential witness"); *see also id.* (specifying that "[t]he video footage neither negates nor supports the . . . Officers' testimony" that "Ocran made any furtive movements" while fleeing from the Officers). Accordingly, as discussed *supra* Part III.A., this contention fails to the extent it is merely a repackaged attempt to challenge the district court's determination that there is a genuine dispute of material fact as to whether Ocran made any "furtive movements" while fleeing from the Officers.[9]

---

[9] The central premise of our dissenting colleague's position is that the district court did not deem there to be genuine disputes of material fact as to whether Ocran made any "furtive movements" while fleeing from the Officers. But the dissent's view is belied by the court's conclusion that it could not resolve — at the summary judgment stage — whether Ocran "reached into his waistband" or "made any furtive movements" while fleeing from the Officers. *See* Summary Judgment Ruling 29 n.6. Simply put, those material facts are readily in dispute and should be decided by the jury, not an appeals court.

27

Next, the Officers posit that "even assuming arguendo that the [district court] properly defined the constitutional right at issue, it erred in finding that any such right was clearly established." *See* Br. of Appellants 46.[10]  The Officers assail the Summary Judgment Ruling's reliance on our Court's decision in *Henry v. Purnell*, claiming that precedent "cannot stand for this proposition as it was undisputed that the fleeing suspect in that case was unarmed." *Id.*  According to the Officers, *Henry* did not touch on the precise situation presented in this Fourth Amendment excessive force case — that is, "whether individuals have a right to be free from deadly force when armed and fleeing." *Id.* at 47.

With respect to this purely legal argument, we possess jurisdiction.  *See Winfield*, 106 F.3d at 53 (explaining that court of appeals may properly exercise jurisdiction "over a claim that there was no violation of clearly established law accepting the facts as the district court viewed them").  But the argument is simply without merit under our 2011 decision in *Henry*, as well as the Supreme Court's 1985 decision in *Tennessee v. Garner*, 471 U.S. 1 (1985).  As we explained in *Henry*, "[a] police officer who shoots a fleeing suspect without probable cause to believe that the suspect poses a significant threat of death or

---

[10] It is notable that, in the underlying summary judgment proceedings, the Officers advised the district court that there was "no need . . . to weigh the second prong of the [qualified immunity] framework." *See Cooper v. Doyle*, No. 8:22-cv-00052, at 20 (D. Md. Oct. 13, 2023), ECF No. 44-1.  Arguably, the Officers thereby invited the alleged error of which they now complain. *See, e.g.*, *United States v. Jackson*, 124 F.3d 607, 617 (4th Cir. 1997) ("The 'invited error' doctrine recognizes that a court cannot be asked by counsel to take a step in a case and later be convicted of error, because it has complied with such request.").  Putting any alleged invited error to the side, however, we are readily satisfied that, applying a de novo standard of review, the Officers' appellate contentions regarding the second prong of the qualified immunity standard lack merit.

serious physical injury to the officer or others violates that suspect's Fourth Amendment rights." *See* 652 F.3d at 254 (citation modified). Similarly, in *Garner*, the Supreme Court recognized that "shooting nondangerous fleeing suspects is [not] so vital as to outweigh the suspect's interest in his own life." *See* 471 U.S. at 11. The *Garner* Court elaborated:

> [T]he use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. It is not better that all felony suspects die than that they escape. However, where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

*See* 471 U.S. at 11 (citation modified).

Pursuant to *Garner* and *Henry*, Ocran had a clearly established Fourth Amendment right to be free from deadly force while fleeing from the Officers and without otherwise posing a significant threat of death or serious physical injury to the Officers or others. Indeed, that Ocran was armed while fleeing from the Officers does not change the analysis, nor does it render *Garner* or *Henry* inapposite. For starters, our Court's longstanding precedent is that simply being armed is not grounds for law enforcement to employ deadly force, unless that person makes some sort of furtive or other threatening movement with the weapon. As Judge Agee recently explained in *Knibbs v. Momphard*,

> the failure to obey commands by a person in possession of . . . a weapon only justifies the use of deadly force if that person makes some sort of furtive or other threatening movement with the weapon, thereby signaling to the officer that the suspect intends to use it in a way that imminently threatens the safety of the officer or another person.

29

*See* 30 F.4th 200, 225 (4th Cir. 2022) (summarizing *Hensley ex rel. North Carolina v. Price*, 876 F.3d 573 (4th Cir. 2017); *Cooper v. Sheehan*, 735 F.3d 153 (4th Cir. 2013); *Anderson v. Russell*, 247 F.3d 125 (4th Cir. 2001); *Sigman v. Town of Chapel Hill*, 161 F.3d 782 (4th Cir. 1998); *Elliott v. Leavitt*, 99 F.3d 640 (4th Cir. 1996); *McLenagan v. Karnes*, 27 F.3d 1002 (4th Cir. 1994); and *Slattery v. Rizzo*, 939 F.2d 213 (4th Cir. 1991)).  Although Ocran was armed at the time he was fleeing from the Officers, on the undisputed facts, Ocran did not make any "furtive or . . . threatening movement with the weapon." *Id.*[11]

Moreover, if we accept the Officers' contention that Ocran being armed somehow renders *Henry* inapposite — and leads to Ocran being viewed as "threatening" to the Officers — we would create inconsistency within our own precedent.  Indeed, it would be entirely inconsistent to define the word "threatening" differently here than in *Hensley* (2017), *Cooper* (2013), *Anderson* (2001), *Sigman* (1998), *Elliott* (1996), *McLenagan* (1994), and *Slattery* (1991).  Again, those seven cases stand for the proposition that presence of "a weapon only justifies the use of deadly force if that person makes some sort of furtive or other threatening movement with the weapon." *See Knibbs*, 30 F.4th at 225.

\* \* \*

---

[11] We observe that it matters not that the CI had related to Corporal Dakkouni in text messages that Ocran would "shoot it out" if confronted by the police. *See supra* at 5 (quoting J.A. 442).  In this collateral order appeal, however, the undisputed evidence is that Ocran was endeavoring to get away from the Officers, not confront them.

It is well-established that public officials are entitled only to "fair notice" — not a case with identical facts — to understand whether their conduct violates an individual's clearly established constitutional right. *See Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). And as explained above, even if "there is no case directly on point factually to inform our [clearly established] analysis," a constitutional right can be clearly established if "core constitutional principles set forth in numerous cases lead us to the conclusion that [a plaintiff's] substantive due process right was clearly established" at the time of the constitutional violation. *See Dean*, 976 F.3d at 418. With that in mind, we conclude that Ocran's Fourth Amendment right to be free from deadly force was clearly established in January 2021 when the Officers shot Ocran in the back multiple times while he was fleeing and otherwise posing no threat to the defendant Officers or anyone else.

## IV.

Pursuant to the foregoing, we dismiss the Officers' collateral order appeal from the Summary Judgment Ruling and the Reconsideration Ruling, to the extent the Officers seek to improperly challenge the district court's determinations that genuine disputes of material fact exist on this summary judgment record. Otherwise, we affirm the court's ruling that, based upon the undisputed facts, the Officers are not entitled to qualified immunity with respect to the plaintiff's Fourth Amendment excessive force claim. Finally, we remand for such other and further proceedings as may be appropriate, including a jury trial.

*DISMISSED IN PART,*
*AFFIRMED IN PART,*
*AND REMANDED*

31

RUSHING, Circuit Judge, dissenting:

I agree with the majority that we lack collateral order jurisdiction to review the Officers' contention that the district court erred in finding certain material facts disputed. But we do have jurisdiction to resolve the Officers' argument that, even viewing the two material factual disputes the district court identified in the light most favorable to the Plaintiff, the Officers did not violate Ocran's clearly established rights. Our precedents draw a bright line, making clear that an armed person's failure to obey police commands justifies deadly force if the person makes a threatening movement signaling to the officer that the person intends to use the weapon in a way that imminently threatens the safety of the officer or another person. *Knibbs v. Momphard*, 30 F.4th 200, 225 (4th Cir. 2022). Those precedents entitle the Officers to qualified immunity here.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Accordingly, law enforcement officers are entitled to qualified immunity "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). "'Clearly established' means that, at the time of the officer's conduct, the law was 'sufficiently clear that every reasonable official would understand what he is doing' is unlawful." *Id.* at 63 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). While "a case directly on point"

32

is not necessary for a right to be clearly established, "existing precedent" must have placed the unlawfulness of the officer's conduct "beyond debate." *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam) (internal quotation marks omitted). "It is not enough that the rule is suggested by then-existing precedent." *Wesby*, 583 U.S. at 63. Rather, "[t]he precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Id.* "This demanding standard protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

The "clearly established" standard also requires that the contours of the legal rule be "so well defined" as to "clearly prohibit the officer's conduct in the particular circumstances before him." *Id.* (internal quotation marks omitted). "This requires a high degree of specificity." *Id.* (internal quotation marks omitted). The Supreme Court has "repeatedly stressed that courts must not define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Id.* (internal quotation marks omitted). "The dispositive question is whether the violative nature of *particular* conduct is clearly established." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (internal quotation marks omitted). "This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* (internal quotation marks omitted).

"Specificity is especially important in the Fourth Amendment context." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (per curiam) (internal quotation marks omitted). Regarding "[u]se of excessive force" in particular, the Supreme Court has explained that

33

"'the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Id.* (quoting *Mullenix*, 577 U.S. at 13). For example, *Tennessee v. Garner* established the general principles that "[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead" but "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." 471 U.S. 1, 11 (1985). The Supreme Court has repeatedly held that "the general rules set forth in '*Garner* . . . do not by themselves create clearly established law outside an obvious case.'" *Kisela*, 584 U.S. at 105 (quoting *White*, 580 U.S. at 80); *see also Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam).

Turning to this case, the district court relied exclusively, and erroneously, on *Henry v. Purnell*, 652 F.3d 524 (4th Cir. 2011) (en banc), to articulate the clearly established law applicable to the Officers' conduct. The district court reasoned that *Henry* "had clearly established the right to be free from deadly force when armed, fleeing, and nonthreatening." *Cooper v. Doyle*, No. DKC 22-0052, 2024 WL 3568564, at *14 (D. Md. July 29, 2024). That was incorrect for two reasons. First, the suspect in *Henry* was not armed or even suspected to be armed. *See Henry*, 652 F.3d at 527 ("Officer Robert Purnell shot Frederick Henry, an unarmed man . . . ."); *id.* at 532 ("[A] reasonable officer in these circumstances would have had no grounds for believing Henry was armed or dangerous."); *id.* at 532 n.9 ("Purnell had no reason to believe, or even suspect, that Henry was armed."); *see also Amisi v. Brooks*, 93 F.4th 659, 667 (4th Cir. 2024) (describing *Henry*). The

34

difference between an armed suspect and an unarmed one is significant. For that reason alone, *Henry* does not "'squarely govern[]' the specific facts at issue" here. *Kisela*, 584 U.S. at 104 (quoting *Mullenix*, 577 U.S. at 13).

Second, the district court was wrong to define the clearly established right as a right to be free from deadly force when "nonthreatening." A suspect's status as "nonthreatening" does not describe "'*particular* conduct'"—it is a conclusion drawn from various facts. *Mullenix*, 577 U.S. at 12 (quoting *al-Kidd*, 563 U.S. at 742). The unlawfulness of the Officers' conduct "'does not follow immediately from'" the rule that an officer cannot use deadly force against a nonthreatening suspect, because one must first assess Ocran's particular conduct to determine whether it qualifies as nonthreatening. *Wesby*, 583 U.S. at 64 (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). Such a "rule is too general." *Id.*

The majority's rule is no better. Relying on *Henry* and *Garner*, the majority identifies a clearly established right "to be free from deadly force while fleeing from the Officers and without otherwise posing a significant threat of death or serious physical injury to the Officers or others." Maj. Op. 29. The Supreme Court has twice "considered— and rejected—almost that exact formulation of the qualified immunity question" as too general. *Mullenix*, 577 U.S. at 12. In *Mullenix*, the Court rejected the formulation that it was clearly established "that a police officer may not use deadly force against a fleeing felon who does not pose a sufficient threat of harm to the officer or others." *Id.* (internal quotation marks omitted). In *Brosseau*, the Court rejected the formulation that it was clearly established that "'deadly force is only permissible where the officer has probable

35

cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.'" *Id.* (quoting *Haugen v. Brosseau*, 339 F.3d 857, 873 (9th Cir. 2003), *rev'd*, 543 U.S. 194). In both cases, the Supreme Court summarily reversed, holding that "use of *Garner*'s 'general' test for excessive force was 'mistaken.'" *Id.* at 13 (quoting *Brosseau*, 543 U.S. at 199); *see id.* at 16, 19. Likewise here, the majority recites *Garner*'s test, but that test is "cast at [too] high [a] level of generality" to "clearly establish the answer" in this case. *Brosseau*, 543 U.S. at 199 (internal quotation marks omitted).

To define the right at issue with the requisite level of specificity, we must first identify "the specific facts" confronting the Officers when they used deadly force. *Kisela*, 584 U.S. at 104. On appeal from the denial of qualified immunity at summary judgment, we "take the facts as the district court gives them to us, and we view those facts in the light most favorable to the plaintiff." *Hicks v. Ferreyra*, 965 F.3d 302, 309 (4th Cir. 2020) (internal quotation marks and emphasis omitted).

According to the district court, the "Plaintiff accepts Defendants' version of the facts, with two exceptions." *Cooper*, 2024 WL 3568564, at *5. The Plaintiff asserted, and the district court found, two disputed material facts: "(1) [whether] Mr. Ocran pointed a firearm at Defendant Officers, and (2) [whether] Mr. Ocran discharged a firearm at Defendant Officers." *Id.*; *see id.* at *13 ("Because genuine disputes of material fact remain as to whether Mr. Ocran pointed and fired his firearm, Defendants are not entitled to summary judgment . . . ."). At this stage, we accept the Plaintiff's version of the facts: that Ocran did not point his gun at the Officers or fire it and that the Officers' version of events is otherwise correct.

36

Accordingly, the question for qualified immunity is whether it was clearly established in January 2021 that an officer may not use deadly force against a person who, although prohibited from possessing a firearm, nevertheless is armed with a gun on his person, who has told an informant (who then told police) that he is "not going back to jail he will shoot it out," and who runs from police after they announce their presence, looks back and angles his body toward pursuing officers several times, disobeys their commands to stop running and stop reaching for his waistband, and instead pulls the gun from his waistband. *Id.* at *1; *see id.* at *1–4. The answer is no. Neither the majority, the district court, nor the parties identify any precedent clearly establishing such a right or, frankly, anything close to it.

The majority cites *Knibbs*, a case in which the decedent "possesse[d] a firearm inside his own home while investigating a nocturnal disturbance" and "ignore[d] commands [from outside the home] to drop the weapon" but did "not aim the weapon at the officer or otherwise threaten him" and could not "visually verify that" the officer was in fact law enforcement. 30 F.4th at 223. Obviously, *Knibbs*'s holding is worlds apart from the facts of this case. But *Knibbs* did summarize our precedent relevant to that circumstance as "clearly establish[ing] that the failure to obey [police] commands by a person in possession of, or suspected to be in possession of, a weapon only justifies the use of deadly force if that person makes some sort of furtive or other threatening movement with the weapon, thereby signaling to the officer that the suspect intends to use it in a way that imminently threatens the safety of the officer or another person." *Id.* at 225.

37

Applying even that standard, the Officers are entitled to qualified immunity. Ocran knew that the Officers were police, disobeyed their commands to stop running and stop reaching in his waistband, was fleeing and looking back at the Officers, and at some point reached in his waistband for a gun and took it out, which the Officers saw. We have mountains of precedent saying that officers are entitled to immunity when they shoot under such circumstances. *See*, *e.g.*, *Benton v. Layton*, 139 F.4th 281, 286–287, 290–291 (4th Cir. 2025) (holding officers were entitled to qualified immunity for shooting suspect after they ordered the suspect to show his hands but he failed to do so, instead making movements inside the car which were obscured from the officers); *Slattery v. Rizzo*, 939 F.2d 213, 215–217 (4th Cir. 1991) (holding officer was entitled to qualified immunity for shooting suspect after he twice ordered the suspect to put his hands up, but the suspect ignored those commands, instead reaching down to an area out of the officer's sight and grabbing an object that turned out to be a beer bottle); *Anderson v. Russell*, 247 F.3d 125, 128, 131–132 (4th Cir. 2001) (holding officer's use of deadly force was reasonable during his investigation of a man thought to be armed after the officer ordered the man to get down on his knees and put his hands up, but the man began reaching in his back left pocket for what turned out to be a Walkman radio); *cf. Knibbs*, 30 F.4th at 222 ("[A]n officer does not have to wait until a gun is pointed at the officer before the officer is entitled to take action." (internal quotation marks omitted)).

The majority rejects this conclusion by creating a finding the district court never made. The majority says the district court "determin[ed] that a reasonable jury could conclude . . . that Ocran never 'reached into his waistband'" or "made any furtive

38

movement while fleeing from the Officers." Maj. Op. 24, 27 (quoting *Cooper*, 2024 WL 3568564, at *11 n.6). But the district court did not make that finding. In the single reference to furtive movement in the district court's opinion, the court noted the Officers' testimony about Ocran reaching into his waistband and said it "must be careful" not to accept self-serving testimony when the victim is dead. *Cooper*, 2024 WL 3568564, at *11 n.6. That is demonstrably *not* a determination that a reasonable jury could find Ocran made no furtive movements. Notably, the court identified no evidence that would support a finding contrary to the Officers' testimony, as one would expect when a court declares a fact to be genuinely disputed.[*]

By contrast, the district court was crystal clear in identifying the only two disputed material facts that prevented summary judgment here: "whether[] (1) Mr. Ocran pointed a firearm at Defendant Officers, and (2) Mr. Ocran discharged a firearm at Defendant Officers." *Id.* at *5; *see also id.* at *10 ("The parties dispute whether Mr. Ocran threatened Defendant Officers with his firearm by pointing it and shooting."); *id.* at *12 ("[A] reasonable jury could conclude that Mr. Ocran never fired a shot. A reasonable jury could also conclude that Mr. Ocran never pointed a handgun at Defendant Officers."); *id.* at *13 ("[A] reasonable jury could conclude . . . that Mr. Ocran never turned around to point a gun at Defendant Officers" and "that Mr. Ocran never fired a shot."); *id.* ("Because genuine

---

[*] Moreover, the court did not call into question other, independent evidence that Ocran at some point retrieved his gun. *See*, *e.g.*, *id.* at *4 ("Officer Doyle saw a firearm in Mr. Ocran's hand."); *id.* at *5 (a loaded handgun with one round in the chamber "was recovered from the area near Mr. Ocran's right hand"); *id.* at *6 (gunshot residue was found on Ocran's hand and the cuff and sleeve of his coat).

disputes of material fact remain as to whether Mr. Ocran pointed and fired his firearm, Defendants are not entitled to summary judgment . . . ."); *id.* at \*15 ("Because a jury could conclude that Mr. Ocran never pointed a firearm at Defendant Officers, there is a genuine dispute as to whether Defendant Officers acted reasonably . . . ."); *id.* at \*19 ("Here, as discussed, genuine disputes of material fact remain as to whether Mr. Ocran pointed or fired a firearm at Defendant Officers."). We have acknowledged that parsing a district court's "determinations regarding factual disputes" can be "complicated" in some cases on appeal from the denial of qualified immunity. *Iko v. Shreve*, 535 F.3d 225, 234 (4th Cir. 2008). But the district court here repeatedly emphasized the two disputed facts that it believed prevented qualified immunity. The majority errs by adding to the district court's findings and then using its newly created factual disputes to deny the Officers the immunity to which they are entitled.

Accordingly, I respectfully dissent.